**James TEMPLE, Sr., Personal Representative of the Estate of April L. Temple, Deceased, Plaintiff,**

v.

**WISAP USA IN TEXAS, et al., Defendants.**

No. 8:CV90–00731.

United States District Court, D. Nebraska.

Dec. 10, 1993.

James Welsh, D.C. Bradford, Bradford, Coenen & Welsh, Omaha, NE, for plaintiff.

Charles Gotch, Cassem, Tierney, Adams, Gotch & Douglas, Milton A. Katskee, Katskee, Henatsch & Suing, Omaha, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

After I referred this difficult matter to her, (Filing 94), United States Magistrate Judge Kathleen A. Jaudzemis conducted a thorough hearing and wrote two thoughtful opinions, (Filings 123 and 133), regarding the distasteful subject of whether James Welsh (Welsh), attorney for Plaintiff, engaged in conduct violative of Federal Rule of Civil Procedure 11, and, if so, what the appropriate sanctions should be.

Judge Jaudzemis concluded that Welsh had indeed violated Rule 11, and she imposed sanctions in the form of fully compensatory attorney fees and expenses of $39,959.75, ordering that Welsh should personally pay said sum. Welsh timely appealed.

I shall affirm the decision of Judge Jaudzemis that Welsh violated Rule 11, but I shall reverse the award of $39,959.75 as sanctions. Instead, I shall impose sanctions in the form of a reprimand, an admonishment, and an order for Welsh to pay the sum of $15,000 to the aggrieved party. I find and conclude that the least severe sanctions necessary to vindicate the purposes of Rule 11 should be utilized and that the magistrate judge erred by not selecting such sanctions.[1]

## I.

### A.

■ Before reviewing the facts and law, I must determine the appropriate standard of review. That decision in turn depends upon whether Judge Jaudzemis possessed the statutory (and constitutional) power to enter an order which was binding upon Welsh or whether her order should be construed as a report and recommendation. Neither Welsh nor the moving defendant disputes that Judge Jaudzemis had full power and authority under the relevant statutes, the Constitution, the Federal Rules of Civil Procedure,

and the local rules of practice to enter the binding orders issued in this case without review and adoption by a district judge.[2] This being so, the appropriate standard of review is set forth in 28 U.S.C. § 636(b)(1)(A): a district judge "may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law."

I pause to note that the United States Court of Appeals for the Ninth Circuit came to a different conclusion in a somewhat related context shortly before Judge Jaudzemis entered her last order. See *Estate of Conners v. O'Connor*, 6 F.3d 656 (9th Cir.1993) (holding that a magistrate judge lacked the power to enter binding orders concerning a motion for attorney fees and costs under 42 U.S.C. § 1988). To the extent the Ninth Circuit opinion in *Estate of Conners* may be read as applicable to the sanctions motion in this case, I respectfully conclude that the Ninth Circuit is in error, and decline to follow its opinion.[3]

I disagree with the Ninth Circuit for a variety of reasons. I shall state some of these reasons only briefly because neither Welsh nor the moving defendant complains that Judge Jaudzemis lacked the judicial power to do what she did.

■ First, the plain meaning of the relevant statutes, the Federal Rules of Civil Procedure, and our local rules of practice clearly treat postjudgment motions for sanctions as a "pretrial" matter so long as the offending conduct did not take place during trial, particularly where, as here, the conduct complained of respects a pretrial filing such as an amended complaint. In effect, the word "pretrial" is understood to mean "nontrial."

■ Second, even if 28 U.S.C. § 636(b)(1)(A) did not grant magistrate judges the authority to hear posttrial sanctions motions relating to nontrial conduct, 28

---

**1.** In arriving at this conclusion, I intend no criticism whatever of Judge Jaudzemis. Her work was both thoughtful and thorough.

**2.** Indeed, Judge Jaudzemis carefully considered this point, and following the weight of authority,

concluded that she had full authority to enter binding orders. (Filing 123, at 27–30.)

**3.** Even if I had applied the de novo standard of review in this case, my decision would have been the same.

U.S.C. § 636(b)(3), as implemented by my referral of this matter, (Filing 94), provides the authority. Section 636(b)(3) states that a magistrate judge may be "assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." Generally speaking, there is nothing inconsistent with the Constitution or the laws of the United States in Judge Jaudzemis's being assigned to deal with civil post-judgment sanctions motions of any kind (whether or not involving a trial before a district judge), and there is nothing inconsistent with the law or the Constitution in Judge Jaudzemis's entering binding orders as a result.

Finally, although this is not the time for an extended discussion, the Ninth Circuit's opinion implicitly reflects an unnecessary, textually unwarranted, and historically insupportable solicitude for Article III of the Constitution as regards the exercise of judicial power by non-Article III judges such as United States magistrate judges.

### B.

I have carefully reviewed the facts found by the magistrate judge. I generally find and conclude that her findings of fact are neither clearly erroneous nor contrary to the law.[4] Accordingly, except as otherwise indicated, I adopt Judge Jaudzemis's findings of fact.

To briefly summarize Judge Jaudzemis's carefully detailed factual findings is difficult. In general, however, the following is a fair, but abbreviated, description of those findings.

Essentially, Judge Jaudzemis found that Welsh sued the wrong corporation and that this error resulted from his failure to make any prefiling investigation of the facts alleged in an amended complaint after he was placed on notice of facts which should have caused him to inquire. This was a products liability suit regarding a medical device that allegedly caused April Temple to die on June 14, 1989, when it allegedly malfunctioned during an operation.

When Welsh filed the amended complaint on April 15, 1991, the magistrate judge believed he had failed to affirmatively investigate the corporate status of the defendant Olympus Corporation of America, a *Delaware Corporation*. This corporation was represented by attorney Charles Gotch.

The magistrate judge concluded that: "[A] reasonable attorney, having been informed that the defendant was incorporated in another state than that alleged in the [original] complaint, would be put on inquiry and would have performed some investigation, two or three telephone calls, to verify the defendant's corporate status." (Filing 123, at 41.)

In the original complaint and the amended complaint Welsh sued Olympus Corporation of America, a *California Corporation*, contending that such defendant (with a codefendant) manufactured and sold the offending device. Olympus Corporation of America, a *Delaware Corporation*, appeared and answered.

Although Welsh was justified in filing the first complaint according to the magistrate judge, she believed that had Welsh conducted any prefiling inquiry regarding the amended complaint he would have known that Olympus Corporation, a *New York Corporation*, was the distributor of the offending device.

I note that Olympus Corporation, a *New York Corporation*, had been the subject of a 1983 merger with yet another Olympus Corporation of America, a *New York Corporation*, thus extinguishing Olympus Corporation of America, a *New York Corporation*, sometime in 1983. As noted earlier, Ms. Temple died in 1989. As noted later, the offending device was not sold until August, 1988.

I further note that both Olympus Corporation, a *New York Corporation*, and Olympus Corporation of America, a *Delaware Corporation*, maintained corporate offices at the same address. However, as Judge Jaudzem-

---

4. Welsh states in his brief on appeal that Judge Jaudzemis's first order "sets forth in significant and accurate detail the procedural history.... The Appellant has no significant dispute with the facts recited in the Magistrate Judge's Order." (Br. Appeal Magistrate Judge's Order Imposing Rule Eleven Sanctions on James R. Welsh at 2.)

is found, Olympus Corporation of America, a *Delaware Corporation,* was formed five or six months *after* April Temple died. Moreover, although Olympus Corporation of America, a *Delaware Corporation,* may in some way be related to Olympus Corporation, a *New York Corporation,* Olympus Corporation of America, a *Delaware Corporation,* was not a successor to Olympus Corporation, a *New York Corporation.* (E.g., Filing 90, Welsh's letter acknowledging receipt of affidavit that Olympus Corporation of America was not a successor to Olympus Corporation and consenting to dismissal.)

Judge Jaudzemis believed that by the time of the filing of the amended complaint in April, 1991, Welsh had eight items of information, (Filing 123, at 36–37), that collectively should have alerted him to the problem and that had he made even a minimal prefiling investigation, he would have realized his error. Those items were: (1) an invoice for the device dated August 8, 1988, stating that the seller was "Olympus, Medical Instruments Division" (although the purchase order referred to "Olympus Corp. of America"); (2) a response to Welsh's notice of breach of warranty by "Olympus Corporation" that said the corporation was only a subdistributor of a named manufacturer which was located at a specific address in Germany; (3) a response from an insurance company regarding Welsh's breach-of-warranty notice naming the insured as "Olympus Corporation"; (4) an answer filed to the first complaint stating that Olympus Corporation of America was a corporation, incorporated in Delaware and not California, and that it did not do business in Nebraska; (5) information provided by the defendant about the names of people with information about the allegedly defective medical device whom Welsh failed to contact and a video tape about the device which Welsh did not seek to obtain; (6) a response to a request for admissions stating that Olympus Corporation of America was a Delaware Corporation and not a California Corporation; (7) answers to interrogatories which stated that the medical device was manufactured in Germany by a German company and sold by an "Olympus Corporation" which was located at a specific address in New York; and (8) a letter from counsel for a codefendant [5] stating that the device was manufactured in Germany.

Welsh filed a separate action against a German corporation on May 1, 1991. In that complaint Welsh alleged that the German corporation designed and manufactured the equipment in question.

By June 14, 1991, the statute of limitations had run.

United States District Judge William G. Cambridge, the trial judge to whom the case was then assigned, denied a motion for summary judgment predicated on the argument that Olympus Corporation of America, a *Delaware Corporation,* did not manufacture or sell the offending device and was not formed until after April Temple's death. The summary judgment motion was filed September 9, 1991, and denied on February 26, 1992.

Welsh made no inquiry regarding the corporate status of the defendant until about March, 1992, when he learned through an associate that: (1) the old Olympus Corporation of America, a *New York Corporation,* was formed in 1977 and merged into Olympus Corporation, a *New York Corporation,* in 1983; (2) Olympus Corporation of America, a *Delaware Corporation,* was formed in November, 1989; (3) Olympus Corporation, a *New York Corporation,* and Olympus Corporation of America, a *Delaware Corporation,* could be reached at the same address in New York; and (4) Olympus Corporation of America, a *Delaware Corporation,* was not in existence at the time April Temple died.

Despite this knowledge and the fact that he had sued a German corporation as the manufacturer and designer of the offending device, Welsh denied a March 30, 1992, request for admission that, in substance, asked Welsh to admit that Olympus Corporation of America was not the designer, producer, manufacturer, distributor, or seller of the offending medical device. Welsh explained to Judge Jaudzemis that the reason he de-

---

5. Welsh also sued WISAP USA in Texas, but the real name of the corporation is WISAP/USA, Inc., a Texas corporation. Welsh later agreed to the dismissal of this defendant on September 2, 1992.

nied the request for admission was because he "didn't have enough information to admit it." (Filing 123, at 17–18.)

As Judge Jaudzemis recited, this case was dismissed with Welsh's consent on October 14, 1992, (Filing 89), after a pretrial conference I conducted. At a September, 1992, conference, and at my urging, Gotch agreed to provide Welsh with documents to establish that: (a) both corporations (Olympus Corporation of America, a *Delaware Corporation,* and Olympus Corporation, a *New York Corporation* ) were in good standing; and (b) Olympus Corporation of America was not a successor to Olympus Corporation. Welsh agreed that if Gotch provided him with certificates of good standing and an affidavit, he would consent to dismissal of the case without prejudice to a motion for sanctions. I entered an order reciting the agreement of the parties and ordered them to perform the agreement. (Filing 85.) After Gotch provided certificates of good standing for both corporations and a corporate officer's affidavit that the defendant Olympus Corporation of America, a *Delaware Corporation,* was not a successor to Olympus Corporation, a *New York Corporation,* Welsh did in fact agree to dismissal, (Filing 90), and the case was dismissed. (Filing 89.)

The relationship between Gotch and Welsh, two seasoned lawyers, was awful. Judge Jaudzemis properly lamented: "The lack of civility demonstrated by opposing counsel in this case is appalling. Each admitted refusing to telephone the other. . . . [Not giving] sufficient notice of non-attendance at out-of-state depositions, and failing to copy communications to opposing counsel are but some of the lapses of courtesy in this case. . . ." (Filing 123, at 41 n. 25.)

After an extensive evidentiary hearing, but without explicitly stating why she choose monetary sanctions, Judge Jaudzemis found that monetary sanctions were appropriate under the facts of this case. (Filing 123, at 41.) Thereafter, the parties submitted various documents regarding the appropriate monetary sanctions and, agreeing that no evidentiary hearing was required, submitted the matter to Judge Jaudzemis on the briefs. I note that both Plaintiff and Olympus Corporation of America, a *Delaware Corporation,* retained separate counsel, in addition to Welsh and Gotch, to serve as cocounsel during the sanctions proceedings.

The magistrate judge reviewed the submissions of Olympus Corporation of America, a *Delaware Corporation.* These submissions, (Filings 124 and 130), revealed that: (1) Gotch (and his firm) claimed fees and expenses since April 16, 1991 (the day after the amended complaint was filed), in the total amount of $24,644.62; (2) a representative of Olympus Corporation of America, a *Delaware Corporation,* claimed expenses of $1,143.78; (3) the law firm of Katskee, Henatsch & Suing (counsel employed by Olympus Corporation of America, a *Delaware Corporation,* for the sanctions litigation) claimed fees and expenses in the total amount of $13,201.85; and (4) lawyer experts for Olympus Corporation of America, a *Delaware Corporation,* who were consulted regarding the sanctions litigation, claimed fees and expenses of $969.50. Total fees and expenses claimed were $39,959.75.

Welsh disputed that he should be required to pay any sanctions. However, there appears to have been no dispute about the general fairness or reasonableness of the claimed fees and expenses, (Filing 126, ¶¶ 7 & 8), except that: (1) Welsh did not believe it fair that he be required to pay for the services of two lawyers for the moving defendant during the sanctions practice, and (2) since the experts did not actually testify, and because no such testimony was needed, Welsh did not think fees for experts were warranted.

On October 19, 1993, Judge Jaudzemis granted the motion for sanctions and awarded monetary sanctions in the sum of $39,-959.75, to be paid personally by Welsh.[6] (Filing 133.) Welsh appealed on October 29, 1993. (Filing 136.) This matter was then briefed, with briefing being completed on November 18, 1993.

---

6. Judge Jaudzemis did not find that Plaintiff, James Temple, Sr., personal representative of the estate of April L. Temple, violated Rule 11. No party contests this point.

## II.

Welsh argues on appeal that: (1) he did not violate Rule 11; and (2) if there was a violation of Rule 11, Judge Jaudzemis failed to select the proper sanctions.

### A.

█ I do not believe Judge Jaudzemis erred when she found that Welsh violated Rule 11 by not making any prefiling investigation regarding the allegations of the amended complaint as to the corporate status of the "Olympus" defendant. I specifically agree that Welsh violated Rule 11 when he filed the amended complaint because he ignored at least eight items of information that would have warned a reasonable lawyer of the possibility of error and of the necessity of making a prefiling inquiry regarding the corporate status of the defendant. Had Welsh investigated the corporate status of the defendant, he would have realized that he had sued the wrong corporation.

█ Federal Rule of Civil Procedure 11 states: [7]

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. A party who is not represented by an attorney shall sign the party's pleading, motion, or other paper and state the party's address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

█ The purpose of Rule 11 is to deter plaintiffs and defendants from filing papers in court which lack factual or legal support in order to save innocent parties and the courts from dealing with frivolous lawsuits. *Am. State Bank v. Pace*, 124 F.R.D. 641, 643 (D.Neb.1987). Neglecting to have an adequate legal or factual basis for a signed paper constitutes a violation of Rule 11. *Id.* at 644. Mistaken judgment, ignorance of the law, or personal belief with regard to what the law should be do not provide the attorney with an excuse or defense if the lawyer who signed the pleading failed to make a reasonable inquiry into the facts and law supporting

---

7. I have applied Rule 11 of the Federal Rules of Civil Procedure as it existed on the date the amended complaint was filed, on the date the motion for sanctions was filed, and on the date briefing was completed. Congress did not act prior to December 1, 1993, to prohibit implementation of the amendments to the Federal Rules of Civil Procedure transmitted to Congress by the Chief Justice of the United States on April 22, 1993. It thus appears that the amendments, including amendments to Rule 11, became effective December 1, 1993, pursuant to 28 U.S.C. § 2072 and paragraph 2 of the Chief Justice's order of April 22, 1993. Pursuant to that order, I find that the 1993 amendments to Rule 11 should not be applied in this case because it would be unjust and impractical to do so since the offending conduct took place prior to the effective date of the amendments, the sanctions motion was filed prior to the effective date of the amendments, and the parties completed their briefing prior to the effective date of the amendments.

the pleading before filing the pleading. *Id.* The standard is objective, not subjective, and is frequently stated as one of " 'reasonableness under the circumstances.' " *Id.* (quoting Schwarzer, Sanctions Under the New Federal Rule 11—a Closer Look, 104 F.R.D. 181, 191 (1985)). The rule obligates a court to impose sanctions when a violation of the rule is proved, although the court has discretion as to what sanctions are employed. *Id.* at 643 (quoting the rule and noting the mandatory language "shall" with regard to the imposition of sanctions and the discretionary language "may" with regard to the type of sanctions).

 Welsh argues that simply because he erred does not mean he violated Rule 11, and he is certainly correct in this statement of the law. *O'Connell v. Champion Int'l Corp.,* 812 F.2d 393, 395 (8th Cir. 1987). However, Judge Jaudzemis did not find a violation of Rule 11 simply because Welsh erred, but rather because he failed to make any prefiling investigation sufficient to give him an objectively reasonable basis for the erroneous assertions about Olympus Corporation of America contained in the amended complaint. Indeed, the magistrate judge did not fault Welsh for filing the original complaint even though it was erroneous. As Judge Jaudzemis correctly pointed out, however, before the filing of the amended complaint Welsh learned at least eight items of information that collectively should have alerted him to the need for a prefiling investigation regarding the amended complaint and the corporate status of the defendant, and yet he filed the amended complaint without *any* inquiry.[8]

 Welsh also argues that he did not err at all because there was no proof that Olympus Corporation of America, a *Delaware Corporation,* was not an "alter ego" of Olympus Corporation. This argument turns

Rule 11 on its head. Welsh had no basis at the time the amended complaint was filed (or at anytime thereafter) for believing Olympus Corporation of America, a *Delaware Corporation,* was an "alter ego" of some other corporation. He had then and has now no more than unsupported speculation for the "alter ego" assertions regarding Olympus Corporation of America.

To begin with, Welsh alleged that Olympus Corporation of America manufactured and sold the offending medical device. He did not allege an "alter ego" theory. As a consequence, Welsh cannot now rely upon such a theory to objectively justify his actions.

 Moreover, there is convincing evidence in the record that Olympus Corporation of America, a *Delaware Corporation,* is a separate corporation from Olympus Corporation, a *New York Corporation.* Still further, there is undisputed evidence that Olympus Corporation of America, a *Delaware Corporation,* was formed after the death of April Temple. There is no evidence, and there never was, that Olympus Corporation of America, a *Delaware Corporation,* had anything whatever to do with the sale or manufacture of the offending medical device. Finally, at the time the amended complaint was filed (and thereafter), there was no evidence that Olympus Corporation of America, a *Delaware Corporation,* was a successor to Olympus Corporation, a *New York Corporation.* (E.g., Filing 90, Welsh's letter acknowledging receipt of affidavit that Olympus Corporation of America was not a successor to Olympus Corporation and consenting to dismissal.) That was why Welsh ultimately agreed to dismissal of the lawsuit. (*Id.*)

In conclusion, from an objective point of view, the fact that Olympus Corporation, a *New York Corporation,* might in some unknown way be related to Olympus Corpora-

---

8. Welsh argues that "Gotch led the Plaintiff's counsel to believe that he had sued the right Defendant, although with possibly a wrong description." (Br. Appeal Magistrate Judge's Order Imposing Rule Eleven Sanctions on James R. Welsh at 6.) I have carefully reviewed this argument, and I disagree. There is no convincing evidence that Gotch misled Welsh. Gotch's pleadings and responses to discovery documents were true as a matter of fact and as responsive as necessary (but no more than necessary). What Welsh really complains about is that Gotch did not specifically explain to him how and why Welsh sued the wrong corporation. While this "failure" on Gotch's part does not disprove Welsh's Rule 11 violation, it is properly considered when assessing what sanctions should be imposed.

tion of America, a *Delaware Corporation,* did not justify Welsh's treating the two corporations as though they were one. I agree with Judge Jaudzemis that Welsh violated Rule 11 when he filed the amended complaint because he sued the wrong corporation as a result of his failure to make any prefiling investigation of the corporate status of the defendant, despite having information that should have alerted him to the need for such investigation.

### B.

 The question thus becomes whether Judge Jaudzemis erred when she selected monetary sanctions fully compensatory of the costs incurred by the defendant as a result of the Rule 11 infraction. Although fully compensatory monetary sanctions can be awarded in proper cases, Rule 11 does not require the imposition of such monetary sanctions. *Pace,* 124 F.R.D. at 646–47. Indeed, the "proper role of rule 11 ... is not to compensate parties for such costs; it is to deter litigation abuse." Schwarzer, Rule 11 Revisited, 101 Harv. L.Rev. 1013, 1020 (1988). See also E. Wiggins et al., The Federal Judicial Center's Study of Rule 11, 2 FJC Directions (Nov. 1991) at 27 (commenting on the "overuse of monetary sanctions").

 Generally speaking, the least severe sanctions consistent with the goals of Rule 11 and proper regard for an attorney's reputation and career should be imposed. *Pace,* 124 F.R.D. at 649. As Judge Schwarzer has stated: "The basic principle governing the choice of sanctions is that the least severe sanctions adequate to serve the purpose should be imposed." Schwarzer, Sanctions Under the New Federal Rule 11—a Closer Look, 104 F.R.D. at 201 (citations omitted.) This is particularly true where the record does not clearly reflect that the defendant gave prior notice of the possibility of sanctions in order that offending counsel might cure his or her error and avoid sanctions. *Pace,* 124 F.R.D. at 648–49.

 In arriving at appropriate sanctions, courts will normally consider the cost of the Rule 11 violation and the presence or absence of mitigating factors. *Id.* at 647. With regard to mitigating circumstances, courts examine the following factors: (a) whether counsel subjectively believed he or she was correct; (b) whether counsel acted in a vindictive or punishing manner regarding the opponent; (c) whether there is a need for discipline; (d) whether counsel has the ability to pay; (e) whether there is a peculiar need for compensation; (f) the degree of frivolousness; and (g) the danger of chilling vigorous and innovative advocacy. *Id.* at 647–649 (citing *Eastway Constr. v. New York,* 637 F.Supp. 558, 571 (E.D.N.Y.1986) (Weinstein, C.J.) (aggrieved party entitled to $1,000 in attorney fees rather than $52,000 claimed despite frivolous nature of complaint where case was brought in good faith, conduct of counsel was otherwise exemplary, and pleading was only marginally frivolous)).

After reviewing the record, I find and conclude that Judge Jaudzemis erred because she did not select the least severe sanctions consistent with the goals of Rule 11. I further find and conclude that substantially reduced monetary sanctions of $15,000, together with a reprimand and admonishment of counsel, are sufficient to further the goals of Rule 11. My reasoning is set forth in the following portions of this memorandum.

### 1.

First, I examine the issue of the cost of the Rule 11 violation to the aggrieved party. Total fees and expenses claimed by the defendant as a result of the Rule 11 violation were $39,959.75. Judge Jaudzemis essentially agreed that such an amount was the cost of the Rule 11 violation to the defendant. I do not believe she erred when she found that such sum was incurred by the defendant as a result of the Rule 11 violation. There is no dispute that such fees were, generally speaking, fair and reasonable.

 That the Rule 11 violation was costly to the defendant weighs in favor of fully compensatory monetary sanctions because fully compensatory monetary sanctions in cases where the costs are large make plain to the offending lawyer the full consequences of the Rule 11 violation to the aggrieved party. This is particularly true where Welsh could have saved everyone an enormous amount of

money by making a few telephone calls. Given the cost of the violation to the aggrieved party and the fact that the harm could have been avoided very easily and inexpensively, if the court were only to look to these factors, fully compensatory monetary sanctions would be entirely justified.

■ However, there is also an "obligation to mitigate" under Rule 11. Schwarzer, Sanctions Under the New Federal Rule 11—A Closer Look, 104 F.R.D. at 202 (citations omitted.) There is little evidence in this record that the aggrieved defendant endeavored to mitigate the costs of the Rule 11 violation by explaining to Welsh how and why he erred, particularly as the Rule 11 violation regarded Welsh's apparent (but unjustified) concern that Olympus Corporation of America, a *Delaware Corporation*, was some type of successor corporation. That mitigation was possible is evident by the fact that Welsh consented to dismissal of the suit after Gotch provided him with certificates of good standing for Olympus Corporation and Olympus Corporation of America and a corporate officer's statement that Olympus Corporation of America was not a successor to Olympus Corporation.

Still further, there is no evidence that Gotch explicitly warned Welsh that he had violated Rule 11 by filing the amended complaint as would now be required under the "safe harbor" provisions of the 1993 amendment to Rule 11.[9] Even before the 1993 amendments, "[i]f a party believes that sanctions are warranted, prompt notice should be given to the allegedly offending party." *Pace*, 124 F.R.D. at 648 (citing *Donaldson v. Clark*, 819 F.2d 1551, 1560 (11th Cir.1987)). Indeed, the Advisory Committee Notes relative to Rule 11 as applied in this case state that "[a] party seeking sanctions should give notice to the court and the offending party promptly upon discovering a basis for doing so."

■ This lack of defense mitigation and notice strongly militates against fully compensatory monetary sanctions. When an aggrieved party does not endeavor to mitigate or provide notice of the possibility of sanctions, the educational and deterrence function of Rule 11 is not served by fully compensatory monetary sanctions. An incentive should not be provided for lawyers to win fees as a result of a Rule 11 violation when the violation and attendant costs might have been earlier cured and mitigated had opposing counsel clearly warned of the Rule 11 violation or taken decisive and clear steps to explain the error. Rule 11 should not be turned into a fee-shifting mechanism as that is not the purpose of the rule. Schwarzer, Rule 11 Revisited, 101 Harv.L.Rev. at 1020.

I next examine the presence or absence of mitigating factors regarding the conduct of the offending lawyer. On balance, I find a significant number of mitigating factors that weigh against fully compensatory monetary sanctions.

■ Although Welsh's actions were objectively unreasonable, when selecting proper sanctions it is appropriate to look at the subjective state of mind of offending counsel. *Pace*, 124 F.R.D. at 647. Understanding the subjective mind of the offending lawyer assists the court in determining what sanctions will best further the purposes of Rule 11. I am of the opinion that Welsh sincerely believed he had sued the right corporation, at least in the sense that he believed that Olympus Corporation of America, a *Delaware Corporation*, was somehow ultimately responsible.

Certain bits of evidence tended to reinforce Welsh's belief, such as the similarity of names of the "Olympus" corporations and the fact that the purchase order stated that the seller was "Olympus Corp. of America." I also recognize that Judge Cambridge, the trial judge to whom the case was then assigned, denied a motion for summary judgment based on the argument that Olympus Corporation of America, a *Delaware Corporation*, did not manufacture or sell the offending device and was not formed until after April Temple's death. This ruling tended to confirm Welsh's subjective belief, although it

9. Fed.R.Civ.P. 11(c)(1)(A) (Dec. 1, 1993).

did not provide an objective justification for his conduct.[10]

Accordingly, Welsh's subjective state of mind weighs against fully compensatory sanctions because there is no willful conduct sufficient to suggest that harsh sanctions are necessary to effectuate deterrence.

■■■■ I next examine whether Welsh acted vindictively when he filed the amended complaint. "Vindictive" conduct on the part of a lawyer may warrant relatively harsh sanctions because there is an obvious need to deter the improper use of litigation as a weapon. This is simply another way of determining whether the conduct was "willful," and therefore appropriate for harsh sanctions so as to coerce compliance. *Eastway Constr.*, 637 F.Supp. at 573. Mean-spirited offenders are thought to be less likely to be deterred by anything short of draconian sanctions compared with negligent, but well-intentioned, offenders.

While there is ample evidence of a reciprocal lack of civility between Welsh and Gotch, there is no persuasive evidence that Welsh acted to punish the defendant or Gotch when the amended complaint was filed. This factor weighs against fully compensatory monetary sanctions.

■■■■ I must also examine whether there is a particular need for discipline in this case. On one hand, Welsh is an experienced lawyer who should have known better. On the other hand, no previous Rule 11 violations have been called to my attention which would suggest the need for relatively harsh sanctions. While Welsh's experience tends to aggravate the seriousness of the offense, the fact that he is apparently not a repeat offender tends to weigh against fully compensatory sanctions. On balance, this case appears to be one where an otherwise ethical member of the bar "slipped on a single occasion"; therefore, the imposition of fully compensatory sanctions is not required to prevent future problems. *Eastway Constr.*, 637 F.Supp. at 573.

With regard to Welsh's ability to pay monetary sanctions and the related issue of the defendant's need for compensation, the record is insufficient to come to any particular conclusions. Welsh did not request a hearing to establish that he would suffer financial hardship if he were obligated to pay monetary sanctions, nor did the defendant request an opportunity to establish that this suit was particularly onerous. These factors do not weigh in favor of or against fully compensatory monetary sanctions.

■■■■ I next examine the degree of "frivolousness" of the offending conduct. *Pace,* 124 F.R.D. at 648–49. As Judge Weinstein has observed, Rule 11 cases are not "adequately described by the frivolous-nonfrivolous dichotomy"; rather, these cases "really do lie along a continuum." *Eastway Constr.*, 637 F.Supp. at 574. One examines the degree of "frivolousness" out of recognition of the ethical duty of lawyers to present to the courts all the nonfrivolous claims of a client, "even if only barely nonfrivolous." *Id.* Because lawyers are forced by their "profession to live close to the line, wherever the courts may draw it," and because "Rule 11 threatens them with severe sanctions if they miscalculate ever so slightly the location of that line," *id.,* "[a]ttorney fee awards of the full market value of services rendered should be reserved for extremely frivolous cases." *Id.*

What made Welsh liable under Rule 11 was his failure to make any prefiling investigation of the allegations of the amended complaint. But, as noted by Judge Jaudzemis, Welsh's initial complaint did not violate Rule 11. In other words, there was no Rule 11 violation when Welsh originally sued what turned out to be the wrong defendant. In my judgment, this finding is strongly indicative that this case, viewed in perspective, was not "extremely frivolous."

■■■■ As noted earlier, when Welsh filed the amended complaint, he was aware of certain facts that tended to support his erroneous subjective belief that he had named

---

**10.** I agree with Judge Jaudzemis that such a ruling does not preclude a finding that Rule 11 was violated given the significantly different purposes of Rule 11 and Rule 56. (Filing 123, at 31–32.)

the correct corporation, such as the similarity of names of the "Olympus" corporations and the fact that the purchase order stated that the seller was "Olympus Corp. of America." Still further, Welsh's subjective belief was later indirectly confirmed to a degree by the fact that Judge Cambridge denied a motion for summary judgment. These factors tend to support a finding that Welsh's conduct was only marginally "frivolous."

On the other hand, Welsh's conduct after he finally got around to investigating the facts suggests that he stubbornly maintained the suit against the defendant in the face of strong evidence that should have caused him to seriously doubt his position.

In March, 1992, Welsh learned through an associate that: (1) the old Olympus Corporation of America, a *New York Corporation,* was formed in 1977 and merged into Olympus Corporation, a *New York Corporation,* in 1983; (2) Olympus Corporation of America, a *Delaware Corporation,* was formed in November, 1989; (3) Olympus Corporation, a *New York Corporation,* and Olympus Corporation of America, a *Delaware Corporation,* could be reached at the same address in New York; and (4) Olympus Corporation of America, a *Delaware Corporation,* was not in existence at the time April Temple died.

Despite this knowledge and the fact that he had sued a German corporation as the manufacturer and designer of the offending device, Welsh denied a March 30, 1992, request for admission that, in substance, requested Welsh to admit that Olympus Corporation of America was not the designer, producer, manufacturer, distributor, or seller of the offending medical device. Welsh lamely explained to Judge Jaudzemis that the reason he denied the request for admission was because he "didn't have enough information to admit it."

Welsh apparently still harbored the belief that Olympus Corporation of America was somehow responsible for the corporation which actually sold the offending device because of the similarity in the addresses of Olympus Corporation and Olympus Corporation of America. However, Welsh did nothing to try to confirm the existence of some type of corporate relationship between Olym-

pus Corporation of America and the other Olympus corporations sufficient to justify proceeding against the defendant. This, in turn, suggests a degree of intransigence supportive of a finding that Welsh's prior conduct in filing the amended complaint was more than marginally frivolous.

All in all, the "degree-of-frivolousness" analysis does not favor fully compensatory monetary sanctions. Welsh's conduct, while frivolous, did not amount to "extremely frivolous" behavior sufficient to support awarding the "full market value of services" rendered by counsel for the defendant, *Eastway Constr.,* 637 F.Supp. at 574, although Welsh's stubborn behavior in March, 1992, suggests that substantial, if not fully compensatory, monetary sanctions are in order.

■ Finally, I examine whether fully compensatory sanctions in this type of case will create a danger of chilling vigorous or innovative advocacy. There is a real danger that vigorous advocacy could be chilled by imposing sanctions of more than $39,000 on lawyers who sue the wrong defendant, particularly where, as here, there is a striking similarity of names and addresses between the corporation which would have been the proper defendant and the corporation wrongly sued. As to the question of innovative advocacy, however, this is a commercial case involving no important public policy questions, and offending counsel did not advocate an innovative theory. There is no danger that monetary sanctions in this case will chill innovative advocacy.

On balance, although there is no danger of impeding innovative advocacy, there is a danger of chilling vigorous advocacy which weighs against fully compensatory monetary sanctions. However, the court should be careful not to discourage aggrieved parties from pursuing violations of Rule 11.

In summary, given the cost of the violation to the aggrieved party, the fact that the harm could have been avoided very easily and inexpensively, and the fact that Welsh was unjustly stubborn, fully compensatory monetary sanctions would be entirely justified if the court were only to look to these factors. However, the following additional

factors force me to conclude that, on balance, fully compensatory monetary sanctions are unwarranted: (1) the absence of mitigation efforts on the part of the aggrieved defendant and the absence of an explicit warning that Rule 11 had been violated; (2) the presence of a subjective belief by offending counsel that he was correct and the absence of evidence that he acted for some improper purpose; (3) the fact that offending counsel is apparently not a repeat offender; (4) the fact that this case was not "extremely frivolous"; and (5) the fact that fully compensatory monetary sanctions could chill vigorous advocacy.

### 2.

■ Having determined that fully compensatory monetary sanctions are not appropriate, I must determine what sanctions are appropriate. Applying the framework set out above, I believe that sanctions in the form of a reprimand, an admonishment that Welsh should be conscious of and strictly abide by the provisions of Rule 11 in the future, and an award of $15,000 to be paid by Welsh to the aggrieved defendant are sufficient to further the aims of Rule 11.

■ In arriving at this conclusion, I generally agree with Judge Schwarzer that in most cases of a first offense "a reprimand from the court will suffice." Schwarzer, Sanctions under the New Federal Rule 11—a Closer Look, 104 F.R.D. at 201. However, in this case, Welsh should feel significant monetary pain because the cost to the aggrieved party was significant, the error could have been easily and inexpensively prevented by a prefiling inquiry, and Welsh's conduct was at times unjustly stubborn. Significant, but not fully compensatory, monetary sanctions will serve the function. of deterrence, while not turning Rule 11 into a fee-shifting rule. See *Crookham v. Crookham*, 914 F.2d 1027, 1029–30 (8th Cir.1990) (affirming decision of trial court to award monetary sanctions of $10,000 despite proof that the cost of the violation exceeded $50,000 in a case where three complaints pleaded securities claims that were not justified by existing law.)

■ I have also arrived at the sum of $15,000 so as not to discourage the filing of legitimate Rule 11 motions. The expenses of litigating the sanctions motion incurred by Olympus Corporation of America, excluding the fees for Gotch and his firm, totaled $15,-315.13 ($13,201.85 for counsel hired explicitly to pursue sanctions; $969.50 for lawyer experts; and $1,143.78 for the expenses of a representative of the defendant). Olympus Corporation of America would not have incurred a large portion of these costs if Welsh had simply admitted his error when the sanctions motion was filed. Although each case must be judged separately, generally speaking, it would not serve the purposes of Rule 11 to discourage the filing of legitimate sanctions motions by failing to make aggrieved parties whole, or nearly so, respecting costs reasonably incurred in proving a violation of Rule 11.

Moreover, such an award is not as likely to chill vigorous advocacy as fully compensatory monetary sanctions since the limited award only compensates the moving party for the sanctions litigation. Furthermore, these costs were incurred by the aggrieved party *after* Welsh had clear notice of the possibility of sanctions. He thus had an opportunity to mitigate these costs by a frank admission of his conduct.

Two additional comments are in order.

■ First, I do not think it proper to endeavor to compensate the defendant for Gotch's fees. I reached this conclusion because I do not think the sanctions practice required two separate law firms to represent the defendant's interest. If Gotch was concerned that he was required to serve as a witness during the sanctions practice, he could have and should have withdrawn and left the representation to counsel hired explicitly to handle the sanctions litigation.[11] Moreover, a large portion of Gotch's fee is based on his substantive defense of the underlying litigation, and, as indicated above,

---

11. I also note that Judge Jaudzemis could not determine from the fee statements when Gotch was acting as a witness and when he was acting

as a lawyer during the sanctions proceedings. This further suggests a need to limit the award.

fully compensatory sanctions are, in my judgment, unwarranted.

 Second, I think it fair to consider the fees of the lawyer experts, although they did not testify. The experts were consulted during a time when it was uncertain whether or not Welsh would litigate the "fairness and reasonableness" question. Consequently, consideration of these fees is warranted.

Accordingly,

IT IS ORDERED that:

(1) Welsh's appeal, (Filing 136), is granted in part and denied in part as provided herein;

(2) The appeal is denied to the extent that it challenges the finding, (Filing 123), that Welsh violated Rule 11;

(3) The appeal is granted to the extent that it challenges the award of sanctions in the sum of $39,959.75, (Filing 133), as the court finds that Magistrate Judge Jaudzemis erred as matter of law in failing to impose the least severe sanctions necessary to vindicate the purposes of Rule 11;

(4) Welsh is reprimanded for the Rule 11 violation, admonished that he should be conscious of and strictly abide by the provisions of Rule 11 in the future, and ordered to pay the sum of $15,000 to Olympus Corporation of America, a Delaware Corporation, within thirty (30) days of the entry of a separate judgment in this case.[12]

## JUDGMENT

IT IS ORDERED that, based upon the court's previous Memorandum and Order, filed this date, Attorney James R. Welsh is reprimanded for violating Rule 11, admonished that he should in the future be conscious of and strictly abide by the provisions of Rule 11, and ordered to pay the sum of $15,000 to Olympus Corporation of America, a Delaware Corporation, within 30 days of the entry of this judgment.

12. It is questionable whether a separate judgment is required, but I shall enter a separate judgment so as to avoid any confusion.

## ORDER

JAUDZEMIS, United States Magistrate Judge.

This matter is before me pursuant to 28 U.S.C. § 636 and the referral of Judge Kopf on the post-judgment motion of defendant Olympus Corporation of America (OCA) for Rule 11 Sanctions (filing No. 93).

## BACKGROUND

This is a products liability action in which plaintiff contends that the decedent, April L. Temple, died during surgery due to the malfunction of surgical equipment allegedly designed, produced, manufactured, distributed or sold by defendants OCA and WISAP USA in Texas (WISAP/Texas).[1] The current dispute stems from the similarity of the names of three corporations: (1) defendant OCA, a Delaware corporation (2) "Olympus Corporation," a New York corporation, and (3) "Olympus Corporation of America," a New York corporation formed in 1977 which was merged into Olympus Corporation in 1983.

Reflecting certain information contained in the purchase order for the sale of an Olympus Hystero–Insufflator to the hospital, the complaint in this case alleged that OCA is a *California* corporation. During discovery, OCA repeatedly informed plaintiff that OCA was a Delaware corporation formed after the death of April Temple and that the wrong corporation had been identified as a defendant. Plaintiff's counsel did not investigate OCA's corporate status after receiving this information and filed an amended complaint on April 15, 1991, again naming OCA as a defendant. OCA's motion for summary judgment was denied on February 26, 1992, and OCA continued to defend the lawsuit. The case against OCA was dismissed on October 14, 1992 pursuant to Fed.R.Civ.P. 41(a)(2) for the reason that plaintiff had named the wrong corporation as a defendant.[2]

OCA subsequently filed its motion for Rule 11 sanctions, alleging, in summary, that:

1. This defendant's actual name is WISAP/USA, Inc., a Texas corporation.

2. See filings Nos. 85, 86, 88 and 89.

1. the filing of this action was not, to the best of plaintiff's counsel's knowledge, information and belief, formed after reasonable inquiry, well grounded in fact;

2. plaintiff's counsel never made a reasonable investigation into the facts of the case;

3. plaintiff's counsel never engaged or had available an expert who could render competent testimony that the equipment was defective in design or manufacture;

4. despite the information acquired by plaintiff's counsel, he continued to prosecute the action against OCA after the pleadings and OCA's discovery responses demonstrated that the action against OCA was groundless; and

5. that plaintiff's counsel filed an amended complaint naming OCA as a defendant, despite counsel's knowledge that the action against OCA was groundless.

OCA seeks appropriate sanctions against plaintiff's counsel, James Welsh, including, but not limited to, its costs, expenses and attorney's fees incurred in the defense of the action, and for attorney's fees incurred in prosecuting this motion.

A hearing was held on February 10 and 11, 1993, during which the following evidence was presented.

## FACTS

Plaintiff's decedent, April L. Temple, died on June 14, 1989, of a massive gas phase embolism during a diagnostic laparoscopy at St. Elizabeth's Hospital in Lincoln, Nebraska.

During the procedure, the surgeon, Dr. Gregory W. Heidrick, used two machines that were the subject of this lawsuit: (1) a WISAP High–Flow Insufflator, serial No. 8845432, and (2) an Olympus Hystero–Insufflator, serial No. 8845745.

On June 15 and 16, 1989, at the hospital's request, representatives of ECRI[3] examined the two insufflators. Aside from a suggestion that the gauges on the Olympus Hystero–Insufflator be adjusted, ECRI found nothing wrong with either machine and recommended that both be placed in service after testing by the manufacturer.

### Counsel's Preliminary Investigation

April Temple's father, James Temple, Sr., was referred to Welsh by another attorney, Herb Friedman, and contacted Welsh in November 1989. Their initial contact was a telephone conversation in which they discussed the complaint, the procedure, background, and Temple's conversation with the doctor.

Mr. Temple and his wife (together, "plaintiffs")[4] then came to Welsh's office where they discussed the nature of Welsh's representation. They also talked about the incident itself, including the particular date of the incident for statute of limitations purposes. After discussing the facts, Welsh gave plaintiffs a "regular investigation booklet" which he typically used to obtain background information. Plaintiffs completed the investigation booklet and returned it to Welsh two to three weeks after the first meeting.

In November or December of 1990, Mr. Temple signed a waiver allowing Welsh access to April Temple's medical records. Welsh also explained his contingent fee arrangement and had plaintiffs sign a contingent fee agreement.

After receiving the completed investigation booklet, Welsh obtained the medical records from the hospital and from Dr. Heidrick. He received these records (Exhibit 8, Surgeon's Operative Record, and Exhibit 17, autopsy report, both dated June 14, 1989) in approximately January 1990. Welsh reviewed these records within one week of receipt and forwarded the records to Mr. Temple.

Welsh testified that prior to filing the complaint he also sent the medical records to a medical expert, James Brown, for an informal analysis. According to Welsh, Brown is now an attorney, but had been a physician

---

3. "ECRI" stands for Emergency Care Research Institute. ECRI is a nonprofit agency that evaluates medical devices and publishes its results.

4. April Temple's natural mother, Lisa Abbey, who resides in Michigan, also contacted Welsh at some time before this lawsuit was filed.

for 15 years before becoming an attorney. Brown did not review the ECRI report, and Welsh did not know whether Brown talked to Dr. Heidrick. Apparently, Brown's initial conference was with Welsh's former law partner, Terry Sibbernsen. Sibbernsen did not tell Welsh that Brown talked to Dr. Heidrick, but Welsh testified that he "would not be surprised at all if Mr. Brown talked to Dr. Heidrick."

Based on Brown's oral report, Welsh determined that he did not have a medical malpractice claim. Instead, Welsh determined that April Temple probably died as a result of a malfunction in the insufflators. Accordingly, Welsh tried to determine who designed and manufactured the insufflators and who sold them to the hospital. To this end, Welsh telephoned the hospital's attorney, Bill Johnson, and asked Johnson to find out who sold the insufflators to St. Elizabeth's Hospital. On April 3, 1990, Johnson wrote to Welsh, informing him that there were two insufflators used during the procedure. One was a "Wisap Hiflow Insufflator serial No. 8845432." The other was an "Olympus Hystero–Insufflator serial No. 8845745."

By letter dated April 9, 1990, Johnson agreed to try to provide Welsh with the date of sale. Johnson ultimately provided Welsh copies of the invoices for both machines.

Regarding the sale of the Olympus device, Exhibits 12 and 64 include copies of an invoice dated August 8, 1988, from "OLYMPUS, Medical Instruments Division," directing the buyer to "Mail remittance to PO Box 7118, San Francisco, CA 94120." The description on the invoice relates that the following item was sold to St. Elizabeth Community Health Center: "Cat. No. 8103110 Hystero–Insufflator SR 8845745." The copy of the invoice also bears an illegible Illinois address in the left-hand corner. The Hospital's corresponding purchase order names the seller as "Olympus Corp. of America." [5]

Regarding the sale of the WISAP device, Exhibit 63 includes a copy of an invoice dated June 15, 1988, from "OLYMPUS, Medical Instruments Division," again bearing the address "PO Box 7118, San Francisco, CA 94120." The description on the invoice relates that the following item was sold to St. Elizabeth Community Health Center: "Cat. No. 81A5411 A5411 Electronic Insufflator, Hy–Flow SR# 8845432." The Hospital's corresponding purchase order refers to the seller as "Olympus Corp." [6]

On May 14, 1990, Welsh informed Herb Friedman that he would "probably file a products liability case against the manufacturer of the machine that we believed "gased" April Temple to death during her laparoscopy ... however there were two CO2 machines used and as of this date we do not know which one caused her death."

Welsh testified that in the summer or fall of 1990, he decided to get a "curbside opinion" from a consulting forensic engineer, Herb Egerer. According to Welsh, Egerer said he could not give an opinion without examining the blueprints of the machine. Egerer, who was deposed in December 1992 for purposes of the sanctions hearing, testified that he had been retained by Welsh on numerous occasions but did not recall discussing the Temple case with Welsh.

Based on the foregoing, on October 5, 1990, Welsh sent notices of breach of warranty to Olympus Corporation of America and WISAP/Texas. Welsh sent the letter to Olympus Corporation of America at the California address he received from Johnson.

In response, Welsh received from Richard Kester, Senior Vice President of Olympus Corporation,[7] a letter dated October 16, 1990. The address on the letterhead was "Olympus Corporation, Scientific Products Group, 4 Nevada Drive, Lake Success, NY 11042–1179," and the letter provided as follows:

> We are in receipt of your October 5th transmittal wherein you set forth a Breach

---

**5.** This identification, although in error, was relied upon by Welsh in naming OCA as a defendant.

**6.** Apparently, Welsh did not note the difference between the Hospital's references to "Olympus Corp. of America" and "Olympus Corp." on the two purchase orders.

**7.** Again, Welsh did not note the difference in the corporate names.

of Warranty claim and damages for one April Temple. Since we are only a sub-distributor, your letter has been forwarded to the manufacturer.

WISAP

Rudolf–Diesel–Ring 20

8029 Sauerlach, West Germany

Welsh also received a letter dated October 19, 1990 from Olympus Corporation's insurer, Yasuda Fire & Marine Ins. Co. of America, regarding:

Insured: Olympus Corporation[8]

Claimant: April L. Temple

Date of Loss: 6–14–89

Report date: 10–16–90

Claim No. NO7643

This letter asked that Welsh forward all relevant medical bills and reports, the autopsy report, and the death certificate, plus other information.

Welsh also received a response dated October 26, 1990, from GAB Business Services, Inc.[9] relating that GAB received the notice of breach of warranty dated October 5, 1990.

## Lawsuit Filed

Welsh proceeded to open an estate in Lincoln for purposes of filing this lawsuit and drafted the complaint against the companies to whom he sent the notices of breach. He filed this lawsuit on November 7, 1990.

Regarding the allegations that defendant OCA "designed, produced, manufactured, distributed and sold" the Olympus Hystero–Insufflator, Welsh testified that he knew for certain that Olympus Corporation of America sold the equipment and that it was his experience that companies that distribute or sell often have a lot to do with the design, production and manufacture. Therefore, Welsh includes that language in almost all of his complaints. In other words, Welsh understood that the original designer of the Olympus Hystero–Insufflator was WISAP of Germany but alleged that Olympus Corporation of America was the designer and manufactur-

er of the machine because he "didn't know what [OCA] did after the machine got to them." Welsh also originally estimated that the case was worth about $75,000, which is within the jurisdictional limits of the court.

## Discovery

On or about November 21, 1990, Charles Gotch was retained by OCA to defend the lawsuit. Gotch testified that before he filed the answer, he was advised by his client that the wrong corporation had been identified as a defendant. At this time, Gotch understood that OCA was a holding company and asked OCA's representative whether OCA had anything to do with the sale of medical equipment. Gotch was informed that OCA did not. Gotch testified that he did not ask about OCA's relationship to Olympus Corporation because he didn't need to know. Gotch was specifically advised that OCA was not a successor corporation, and that OCA and Olympus Corporation were separate and distinct entities. According to Gotch, Olympus Corporation sold both pieces of equipment and was the proper defendant in this case.

John Green was retained to represent defendant WISAP USA in Texas.

OCA filed its answer on January 4, 1991, admitting that OCA was a corporation, but denying that OCA was incorporated in California and doing business in Nebraska. The answer alleges instead that OCA is incorporated in Delaware.

Welsh testified that he reviewed his file after receiving OCA's answer to see if he thought he sued the right corporation. Welsh did not perform any other investigation at that time. By this time, Welsh was aware that the ECRI report existed; however, Welsh had not tried to obtain a copy of the ECRI report before he filed the lawsuit because he felt that type of discovery was unnecessary until he had the blueprints and plans. Welsh intended to get the ECRI report once he obtained copies of the plans.[10]

---

8. See supra p. 609 n. 7.

9. GAB is the claims administrator for MED-MARK Insurance Company, the products liability carrier for Wisap/USA.

10. Welsh testified (pp. 73–74, vol. 2) that he was going to try to get the plans through discovery in the case against WISAP/Germany. However, it turned out that the court did not have jurisdiction over that company. He attempted to get

Meanwhile, Welsh served interrogatories and requests for admissions to determine, in part, what the defendants would say regarding the design, manufacture, production, distribution and sale of the machines. OCA served responses to plaintiff's discovery requests on January 8, 1991. (Filing No. 93, Exhibits A–C)

OCA's answers and objections to interrogatories provided the names of three people with information concerning the Hystero–Insufflator allegedly sold by OCA and also provided an unidentified employee of WISAP of Germany. Welsh did not depose any of these individuals at any time. Welsh was also advised that OCA had a videotape demonstrating the use of a hystero-insufflator. Welsh did not ask that the videotape be produced. Welsh explained that, as a financial matter, he did not subpoena the two insufflators for inspection at that time because he didn't have the plans for the machines.

In its response to plaintiff's request for admissions, OCA informed plaintiff that OCA was a Delaware corporation, not a California corporation:

11. [Admit] That the defendant, Olympus Corporation of America, has been correctly named as defendant in the present cause insofar as the legal designation of name is concerned.

RESPONSE: Olympus Corporation of America is the correct name, however, it is not a California Corporation. It is a Delaware Corporation.

. . . .

13. [Admit] That the defendant, Olympus Corporation of America, has been properly served as a party defendant in the present cause.

RESPONSE: Olympus Corporation of America received a Summons, but it is not a California corporation, rather a Delaware corporation.

According to Gotch, OCA had also been asked to admit "a number of things that should have properly been submitted to the person who actually sold the equipment." [11] OCA denied those requests, and denied that it designed, manufactured, assembled or marketed the product in question.

OCA's discovery responses were all verified by Paul Cable, the secretary of OCA. Welsh did not attempt to depose Cable at this time.

OCA served the following answer to plaintiff's supplemental interrogatories on February 21, 1991:

1. Please state the name and address of any person, corporation or entity which you understand had anything to do with the design, manufacture or sale of the Olympus Hystero–Insufflator, which is the subject matter of plaintiff's Complaint.

ANSWER: The Hystero–Insufflator, which is the subject matter of plaintiff's Complaint, was designed and manufactured by WISAP Gesellschaft Fur Wissenschaftlichen Apparatebau MBH, Rudolf–Diesel–Ring 20, 8029 Sauerlach, West Germany. It was sold by Olympus Corporation, 4 Nevada Drive, Lake Success, New York 11042 to the hospital.

These answers were again verified by Paul Cable, who was not deposed by Welsh.

By this time, Welsh had other information that the equipment was manufactured in Germany. The February 14, 1991 letter from WISAP's attorney, John Green, to

jurisdiction "by some discovery procedures with their attorneys." Welsh explained that he would have to find someplace in this country where plaintiff could get jurisdiction over the German company. Financially, it was not worthwhile to do that.

11. Specifically, OCA was asked to admit that it "manufactured, assembled and/or distributed the Olympus Hystero–Insufflator"; that OCA designed or sold the device; that OCA placed the machine in the channels of the trade or stream of commerce; that OCA was engaged in the business of manufacturing, assembling, selling or distributing this and similar products; that the device was defective; that the defective condition made the device unreasonably dangerous and unsafe; that the machine was defective when it was placed on the market and left in OCA's possession; that the machine was expected by OCA to reach the user without substantial change in condition; that the court had subject matter jurisdiction; and that April Temple was a person who was intended to use the device.

Judge Cambridge [12] informs the recipients that "[i]t appears that the equipment in question was manufactured in Germany."

According to Gotch, Green had issued a subpoena to the hospital requiring the hospital to produce the documents pertaining to the sale of the WISAP High–Flow Insufflator and the Olympus Hystero–Insufflator, plus other documents. By letter dated March 26, 1991, Green advised Welsh as follows: "We responded to your Interrogatories and we can tell by your Supplemental Request that you know that the defendant in this litigation, WISAP/USA in Texas, was never in the stream of commerce on these units ... and, based upon Mr. Gotch's Answers to Interrogatories, you can see that the flow of commerce came directly from WISAP/Germany to Olympus United States to St. Elizabeth's Hospital." Green demanded that Welsh dismiss the case against WISAP/USA in Texas; otherwise, he would seek Rule 11 sanctions.[13]

The surgeon, Dr. Gregory Heidrick, was deposed on April 2, 1991 by Welsh, Gotch, and Fred Kauffman. Based on Mr. Brown's earlier review of the case and upon the information revealed during Dr. Heidrick's deposition, Welsh again concluded that the doctor was not negligent.

### Amended Complaint

On April 15, 1991, Welsh filed an amended complaint adding St. Elizabeth Community Health Center as a defendant "to make sure that we recovered as far as any maintenance was concerned on the insufflators." The amended complaint also named WISAP Gesellschaft fur Wissenschaftlichen (WISAP/Germany) as a defendant. Welsh explained at the sanctions hearing that he was "trying to hold things up a little bit so that I can get that company into the lawsuit," but that he had trouble accomplishing service on WISAP/Germany.[14] Welsh ultimately dismissed the case against St. Elizabeth's be-

cause there was no diversity. Filings 42 and 43.

The amended complaint again alleged that OCA was a foreign corporation "organized under the laws of the State of California, and authorized to do and is doing business in the State of Nebraska; [and] that the amount in controversy (exclusive of interest and costs), is in excess of $50,000.00." (Filing 34, p. 12) The amended complaint further alleged that OCA "designed, produced, manufactured, assembled, supplied, distributed, and sold" the Olympus Hystero–Insufflator. Filing 34, p. 14.

In its answer to the amended complaint, OCA again admitted that it was a corporation, denied that it was incorporated in California, alleged that OCA was incorporated in Delaware, and denied that OCA was doing business in Nebraska. OCA's answer to the amended complaint did not prompt Welsh to perform additional investigation, as Welsh interpreted the response as a "form answer" and believed the plaintiff had met the jurisdictional requirements.

On September 9, 1991, Gotch filed a motion for summary judgment on behalf of OCA, together with the affidavit of Paul Cable in support thereof. Cable's affidavit stated that Olympus Corporation of America was formed in December 1989, six months after the death of April Temple, and that OCA did not design, produce, manufacture, distribute or sell the Olympus Hystero–Insufflator. On September 30, 1991, Welsh moved for an extension to respond to OCA's summary judgment motion, specifically to depose Paul Cable. (Filing 48) The motion cites Cable's prior response to plaintiff's supplemental interrogatories that the Hystero–Insufflator was "sold by Olympus Corporation, 4 Nevada Drive, Lake Success, New York 11042 to the hospital."

At this time, Paul Cable resided in New York. On September 27, 1991, Welsh served a notice to take Cable's deposition on Octo-

---

12. Welsh and Gotch received carbon copies of this letter.

13. The case against WISAP USA in Texas was dismissed by Judge Kopf effective September 2, 1992. Filing No. 85.

14. On May 1, 1991, Welsh filed a separate lawsuit in this court against WISAP Gesellschaft fur Wissenschaftlichen, case No. 8:CV91–251. *See supra*, p. 610 n. 10.

ber 7, 1991 in Omaha. Welsh did not discuss the matter with Gotch before scheduling the deposition.[15] By letter dated October 3, 1991, Gotch informed Welsh that Cable resided in New York City, that Cable would not appear to be deposed in Omaha, and offered to make Cable available in New York on a later date. Gotch testified that he also offered to arrange a telephone deposition, but that Welsh declined to depose Cable by telephone. Cable's deposition was never taken because Welsh felt "after our research and the specific information that we had concerning OCA" that he did not need to spend the money to go to New York to refute OCA's summary judgment motion. He also declined to depose Cable by telephone, partly because "we felt that we didn't need the deposition because we had the proof."

Welsh testified that by this time he felt the case had depreciated to a $15,000 to $20,000 lawsuit. He was also convinced that the manufacturer of the equipment was WISAP/Germany and knew that he could not get jurisdiction over the German corporation, but felt that he had to have the diagrams, plans, etc. from WISAP/Germany before he could go forward with the lawsuit.[16]

OCA's motion for summary judgment was denied on February 26, 1992.

In March 1992, Welsh learned of an Olympus Corporation of America, a New York corporation, that was formed in 1977. Welsh's associate investigated Olympus Corporation of America by telephoning the secretaries of state of New York and Delaware. The New York Secretary of State's Office informed Welsh's associate that there had been a previous Olympus Corporation of America incorporated in March 1977 and that in 1983, this corporation was merged into the currently existing Olympus Corporation. The officers of Olympus Corporation could be reached at an address on Nevada Drive in Lake Success, New York. The Delaware Secretary of State's Office gave Welsh's associate the corporate identification number assigned to Olympus Corporation of America. This office also reported that OCA, a Delaware corporation, was formed in late November 1989 and that the corporate officers resided on Nevada Drive in Lake Success, New York. These telephone calls were made in March 1992.

No inquiry was made of the California Secretary of State regarding the Olympus Corporation that was responding and appearing in this lawsuit through Gotch.

On March 30, 1992, plaintiff served responses to requests for admission, admitting that OCA "is a Delaware corporation formed in December 1989"; and that "the fact that the Olympus Corporation of America is a separate and distinct entity that did not exist at the time of the plaintiff's decedent's death, was specifically explained to plaintiff's counsel at the pretrial conference held on January 8, 1992 before Magistrate Judge Richard G. Kopf." Filing No. 93, Exhibit E. Welsh, however, denied the substance of OCA's request that OCA was not the designer, producer, manufacturer, distributor or seller and did not enter into any transaction with St. Elizabeth's Hospital even though Welsh had an action (No. 8:CV91–251) pending in this court against WISAP/Germany alleging that WISAP/Germany designed and manufactured the equipment in question.

**15.** According to Welsh, he did not consult Gotch about scheduling a deposition "because he won't talk."

**16.** Welsh filed the lawsuit against WISAP/Germany, case No. 8:CV91–251, on May 1, 1991. Welsh informed the magistrate judge at the January 8, 1992 pretrial conference that he would not be able to respond to OCA's motion for summary judgment until he could engage in discovery with WISAP/Germany in case No. 8:CV91–251. Apparently, Welsh informed the court at that time that WISAP/Germany had been served with appropriate process but had not yet answered. Filing 55. Welsh acknowledged that he did not advise the magistrate judge of the difficulties he was having serving WISAP/Germany any time between January 8, 1992 and October 14, 1992, when that case was dismissed.

Case No. 8:CV91–251 was originally dismissed for lack of subject matter jurisdiction on June 27, 1991. The June 27, 1991 order was then vacated "in the interests of justice" following plaintiff's motion for new trial, and plaintiff was ordered to serve WISAP/Germany within 120 days. Plaintiff effected service within 120 days, as ordered, and engaged in jurisdictional discovery. On October 14, 1992, Judge Cambridge ordered that the action be dismissed for lack of personal jurisdiction.

Welsh testified that when he served the responses to OCA's requests for admissions, he knew there was an Olympus Corporation of America formed in 1977 in New York, that in 1983 the New York corporation became part of Olympus Corporation, and that there was an Olympus Corporation of America formed five to six months after the death of April Temple. Welsh explained that he denied that OCA did not design, produce, manufacture, distribute or sell the Hystero–Insufflator because he "didn't have enough information to admit it." According to Welsh, he was referring to the New York corporation. He also denied that OCA did not enter into any transactions with St. Elizabeth's Hospital because the requests for admissions did not specify whether it was the Delaware or the New York corporation who had done business with the hospital. Welsh also believed he had "hard evidence" in the form of the St. Elizabeth's purchase order that OCA sold the equipment to the Hospital. Welsh testified that at this time, he knew that all the Olympus corporations "come out of the same law firm, they all have the same address, and they all have the same lawyers acting as secretary of the corporations." [17] According to Welsh, the Olympus corporations were "all the same" and the defendants were "trying to hide the corporation."

Meanwhile, the progression order entered March 23, 1992, requiring completion of discovery by August 24, 1992, remained in effect. Accordingly, Gotch proceeded to depose ECRI and certain employees of St. Elizabeth's Hospital. Gotch testified that he took the depositions of hospital employees Marcia Carkoski, Robert A. Potter and Jean Lynn Dowling because OCA's motion for summary judgment had been overruled and OCA had to comply with the progression order. According to Gotch, the depositions were necessary because OCA had no other information supporting plaintiff's position. Welsh's associate attended the depositions.

The hospital produced its purchase records at the time of these depositions. According to Gotch, the sale documents had been produced earlier pursuant to a subpoena issued by John Green, and all counsel had received copies of those documents.

Carkoski was a registered nurse and was coordinator of general surgery during 1988 and 1989 at St. Elizabeth's Hospital. She was responsible for preparing requisitions for capital equipment purchases, including the two machines in question. During the Carkoski deposition, the hospital produced both pieces of equipment, and Carkoski read into the record all labeling on the two units. The labels on the machine indicated that it had been manufactured in Germany.[18]

Jean Lynn Dowling, the purchasing manager at St. Elizabeth's, testified as to the purchase orders for the two machines. The hospital's purchase order for the Olympus Hystero–Insufflator was made to the attention of "OLYMPUS CORP OF AMERICA." However, the packing list enclosed with the machine was from "OLYMPUS CORPORATION" Scientific Products Group. The corresponding invoice was from OLYMPUS CORPORATION, 20870 Springer Drive, Lombard, IL 60148. The general address listed on the invoice was "PO Box 7118, San Francisco."

Robert A. Potter, manager of BioMedical Electronics at St. Elizabeth's, testified regarding the maintenance records for the two machines. Potter testified that he was present when ECRI representatives Guy Knickerbocker and Bruce Hansel examined the

---

17. Paul Cable and Daniel Callahan, the secretary of Olympus Corporation, a New York corporation, were both lawyers at Whitman & Ransom, a New York City law firm.

18. Carkoski described the Olympus Hystero–Insufflator No. 8845745 as follows. A plate on back of the machine said that it was manufactured by "Gesellschaft Fur Wissenschaftlichen Apparatebau MbH–W., Germany." Under the language, "Olympus Winter Plus IBE," appeared the following: "According to the regulations, § 10 of pressure containers this apparatus has to be given to an annual servicing by Olympus or by one our authorized distributor." The front of the machine contained the language, "Olympus–Hystero–Insufflator ACC2 SEMM." The Hospital's number was 09088.

According to Carkoski, the High–Flow Insufflator bore the name WISAP and Hospital number 09043. The operating instructions were on the front of the High–Flow insufflator. A label on the back of the High–Flow insufflator said "WISAP, made in West Germany, serial No. 8845432."

equipment on June 15, 1989. According to Potter, no repairs were performed on either machine after the ECRI inspection and both machines were returned to service.

After the Potter deposition, Gotch negotiated with Bill Johnson about gaining access to the ECRI report. The Hospital had filed a motion for protective order, alleging that the report was privileged. Gotch and Johnson eventually agreed that the Hospital would permit Gotch to depose the person from ECRI who examined the two pieces of equipment if OCA limited its questions to the equipment and did not inquire about other things examined by ECRI. Welsh resisted the stipulated protective order; however, on August 17, 1992, Judge Kopf granted OCA's motion for protective order and Gotch proceeded to take ECRI's deposition.

The ECRI deposition was held in Greenville, South Carolina on August 19, 1992. Gotch testified that he had to wait for a ruling on the motion for protective order and had only a short time to catch his flight to South Carolina. When Gotch got to his motel in South Carolina, however, he received a message to call his office and was thus advised that Welsh had faxed a letter dated August 17, 1992, to Gotch's office, which stated: "I see no reason for me to be at your deposition tomorrow morning in Atlanta [sic], therefore, proceed without me."

Welsh explained at the sanctions hearing that he chose not to attend the ECRI deposition because he did not want to incur travel expenses reimbursable by his client. Besides, Gotch needed the same information as Welsh—the purpose of this deposition was to determine what investigation was made by ECRI to the insufflators shortly after the incident. Welsh believed that Gotch would satisfactorily perform the deposition and Welsh would have access to the information. Under the circumstances, the expense of traveling to South Carolina to take the deposition was not justified, but the information might come in handy if Welsh ever got the machine plans and hired an expert. Furthermore, Welsh felt he could retake the

deposition as a matter of right "in the other lawsuit" against WISAP/Germany. Welsh chose not to participate in the ECRI deposition by telephone.

Dr. Bruce C. Hansel testified as ECRI's representative that he and Dr. Knickerbocker went to St. Elizabeth's on June 15 and 16, 1989, where they examined two insufflators: (1) Olympus–Winter Plus IBE, type 4641, serial No. 8845745 and (2) WISAP OP–Pneu, serial No. 8845432, type 7050, St. E No. 09043. Their examination revealed no defects in either piece of equipment. Dr. Hansel suggested that the gauges on the Olympus Hystero–Insufflator be adjusted; that was his only recommendation regarding that piece of equipment. He also recommended that both machines be placed in service after testing by the manufacturer, which is a standard recommendation made by ECRI.

The parties appeared before Judge Kopf for a final pretrial conference on September 2, 1992. Counsel did not convene to prepare a pretrial conference order.[19] According to Gotch, he received Welsh's fax of proposed pretrial order on September 2, 1992 at 10:20 a.m., less than one hour before the pretrial conference was scheduled. Welsh's draft listed no experts other than Dr. Heidrick, who had no criticisms of the equipment. Welsh explained at the sanctions hearing that he had decided to proceed on a theory of *res ipsa loquitur* (even though he knew OCA did not have exclusive custody and control over the Olympus Hystero–Insufflator).

Gotch testified that during the pretrial conference, Welsh advised Judge Kopf that OCA was really a successor to Olympus Corporation, and OCA should be in the lawsuit. Gotch advised Judge Kopf that this information was not true and informed the court that Olympus Corporation was an ongoing entity and OCA was not a successor of Olympus Corporation. This position could be easily established by contacting the secretary of state in New York and Delaware and obtaining certificates of good standing and affidavits from one of the officers advising that one was not the successor of the other. Accord-

---

19. Gotch testified that since Welsh had ignored OCA's discovery requests, motion to compel, and other matters, it was impossible to pretry the

case. Therefore, Gotch did not contact Welsh to discuss the pretrial conference. Welsh made similar comments about Gotch.

ingly, there was a discussion during which Welsh agreed to dismiss OCA, provided that OCA provide certain documentation. That agreement was incorporated into Judge Kopf's order of September 3, 1992:

> (3) Within fourteen (14) days after September 2, 1992, counsel for defendant Olympus Corporation of America, a corporation, shall provide counsel for plaintiff with the following:
>
> a. Certificates of good standing for the corporations known as Olympus Corporation and Olympus Corporation of America;
>
> b. A statement indicating that Olympus Corporation of America is not a successor to Olympus Corporation, said statement to be authored by an officer of Olympus Corporation of America;
>
> (4) If counsel for defendant Olympus Corporation of America supplies plaintiff's counsel with the documents described in the foregoing paragraph within the time provided, counsel for the plaintiff agrees that this action may be dismissed as against defendant Olympus Corporation of America, a corporation.

Gotch timely provided Welsh the requested documentation. By letter dated September 9, 1992, Gotch forwarded to Welsh the appropriate certificates from Delaware and New York, and affidavit of Daniel F. Callahan establishing that OCA was not a successor to Olympus Corporation. Gotch observed that it took a telephone call and a fee to get the certificates, and that nothing would have prevented Welsh from making this inquiry as early as January 1991, after Gotch filed the answer denying that OCA was a California corporation.

On September 21, 1992, however, Welsh served a notice to take a records deposition from the keeper of records at the hospital.[20] This deposition was scheduled for October 2, 1992. Gotch received the notice on September 22. On September 24, 1992, Gotch advised Judge Kopf that he had not received a response from Welsh to his letter of September 9 enclosing the corporate certificates, and suggested, "Under the circumstances, I believe that an Order dismissing Olympus Corporation of America in this case, without prejudice to its rights to seek sanctions, is in order." Plaintiff was subsequently given until October 8 to comply with the court's order of September 3, 1992.

On October 12, 1992, Welsh wrote to Judge Kopf, enclosing his status report and agreeing that dismissal against OCA was now appropriate. Filing No. 90. Welsh did not send Gotch a copy of the status report. Gotch testified that he found out the letter only because the order of dismissal entered October 14, 1992 referred to plaintiff's status report. Gotch obtained a copy of the status report from the court file.

Gotch subsequently submitted a bill of costs, supporting brief, and notice of hearing for November 24, 1992 at 10 a.m. Welsh served no written resistance to the bill of costs. Welsh did not appear for the November 24 hearing before the Clerk, and did not inform the Clerk that he would not be attending the hearing.[21] After some delay, the Clerk proceeded with the hearing and costs were taxed in the amount of $912.

## LEGAL ANALYSIS

### I. Jurisdiction

#### A.

Procedurally, this is a post-judgment motion for Rule 11 sanctions. In *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), the Court held that a district court retained jurisdiction to impose Rule 11 sanctions on a plaintiff who voluntarily dismissed his complaint pursuant to Rule 41(a)(1)(i) of the Federal Rules of Civil Procedure by filing a notice of dismissal

---

**20.** This notice prompted Bill Johnson's September 26, 1992 letter to Welsh: "It is my understanding that you already have the information provided in the *Potter* and *Carkoski* depositions, taken by Charlie Gotch. I am providing you now with a copy of the deposition of Mr. Hansel that was taken in Greenville, South Carolina."

**21.** Gotch testified at the sanctions hearing that he didn't telephone Welsh to see why he was not present because Gotch "understood it to be a useless act." Welsh "normally doesn't respond to telephone calls."

before service of an answer or motion for summary judgment.

The present action was dismissed "at the plaintiff's instance" by order of the court pursuant to Rule 41(a)(2). The decision in *Cooter & Gell* contemplates all dismissals pursuant to Rule 41(a): "In order to comply with Rule 11's requirement that a court 'shall' impose sanctions '[i]f a pleading, motion, or other paper is signed in violation of this rule,' a court must have the authority to consider whether there has been a violation of the signing requirement regardless of the dismissal of the underlying action." 496 U.S. at 395, 110 S.Ct. at 2455. *See also Perkins v. General Motors Corp.,* 965 F.2d 597, 599 (8th Cir.1992) (settlement of case did not deprive district court of jurisdiction to enforce Rule 11 sanctions); *Kurkowski v. Volcker,* 819 F.2d 201 (8th Cir.1987).

Similarly, a district court retains jurisdiction over collateral matters, such as motions requesting Rule 11 sanctions and motions requesting attorney's fees, even when final judgment on the underlying action has been entered and is pending on appeal. *See, e.g., Regional Refuse Systems v. Inland Reclamation Co.,* 842 F.2d 150, 156 (6th Cir.1988) (district court retains jurisdiction to decide pending Rule 11 motion while appellate court is considering the dismissal of the action on appeal); *United Energy Owners Comm., Inc. v. United States Energy Management Sys., Inc.,* 837 F.2d 356, 358 (9th Cir.1988) (district court retains jurisdiction to impose Rule 11 sanctions even though plaintiff's appeal from judgment of dismissal is pending); *Garcia v. Burlington N. R.R.,* 818 F.2d 713, 721 (10th Cir.1987) (even after timely notice of appeal is filed, district court retains jurisdiction to determine collateral matters such as propriety and amount of attorney's fees); *Langham–Hill Petroleum Inc. v. Southern Fuels Co.,* 813 F.2d 1327, 1328–29 (4th Cir.) (district court has jurisdiction to award Rule 11 sanctions after notice of appeal had been filed), *cert. denied,* 484 U.S. 829, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987); *Thomas v. Capital*

*Sec. Serv. Inc.,* 812 F.2d 984, 987 (5th Cir. 1987) (district court retains jurisdiction to resolve a motion for attorney's fees or Rule 11 sanctions even while appeal on merits of action is pending in court of appeals); *Masalosalo v. Stonewall Ins. Co.,* 718 F.2d 955, 956 (9th Cir.1983) (district court retains jurisdiction to award attorney's fees after plaintiff filed notice of appeal from decision on the merits); *Obin v. District No. 9 of the Int'l Assoc. of Machinists & Aerospace Workers,* 651 F.2d 574, 583 (8th Cir.1980) (there is no question that district court retains jurisdiction to pass upon a claim for attorney's fees even though notice of appeal on the merits of the action has been filed); *Bergeson v. Dilworth,* 749 F.Supp. 1555 (D.Kan.1990) (filing notice of appeal does not divest district court of jurisdiction over collateral matters such as Rule 11 sanctions).

Accordingly, I find that the district court has jurisdiction to entertain OCA's post-judgment motion for Rule 11 sanctions.

**B.**

Another preliminary issue exists regarding the authority of a magistrate judge to impose Rule 11 sanctions pursuant to 28 U.S.C. § 636. Section 636(b)(1)(A) provides that, with the exception of eight expressly delineated matters considered by Congress to be "dispositive" of a party's claim or defense, *see United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980), a magistrate judge can hear and determine "any" pretrial matter pending before the court.[22]

The terms "dispositive" and "nondispositive" are not found in the language of § 636, but were included by Congress in the language of Fed.R.Civ.P. 72(a), which provides, in part:

A magistrate to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate en-

---

**22.** Magistrate judges do not have authority under § 636(b)(1)(A) to determine motions requesting (1) injunctive relief; (2) judgment on the pleadings; (3) summary judgment; (4) dismissal or quashing of an indictment in a criminal case; (6) dismissal or permission to maintain a class action; (7) dismissal for failure to state a claim upon which relief may be granted; and (8) involuntary dismissal of an action. 28 U.S.C. § 636(b)(1)(A).

ter into the record a written order setting forth the disposition of the matter.

Although Rule 72 does not expressly refer to § 636, the Advisory Committee Notes on Rule 72 make clear that Congress intended the term "nondispositive" to refer to matters not expressly exempted in § 636(b)(1)(A). Furthermore, the legislative history of § 636 confirms that Congress considered all preliminary procedural matters not expressly delineated in § 636(b)(1)(A) to be nondispositive, and therefore properly assigned to a magistrate judge for determination. *See, e.g.,* H.R.Rep. No. 94–1609, 94th Cong., 2d Sess., 10–11 (1976) U.S.Code Cong. & Admin.News pp. 6162, 6170, 6171. (Congress intends that magistrates shall have the power to determine any pretrial matter except the motions specifically enumerated in § 636(b)(1)(A) which Congress considers "dispositive of the litigation").

Thus, both the Federal Rules of Civil Procedure and the legislative history of § 636(b) support the conclusion that magistrate judges have authority to determine any preliminary matter not expressly excepted in § 636(b)(1)(A). In addition, the Local Rules of this court expressly define "nondispositive" matters as those "not excepted by 636(b)(1)(A)." NELR 72.3(b). Local Rule 72.2(b) further provides that "all pretrial procedural and discovery motions" be routinely assigned to a full-time magistrate judge for determination.

Regarding the "pretrial" nature of a post-judgment motion for Rule 11 sanctions, "[c]ourts considering the meaning of the term 'pretrial' as used in [§ 636(b)] have not defined this with respect to the time of trial, but rather have interpreted this to refer to 'a matter unconnected to the issues litigated at trial....'" *Bergeson v. Dilworth,* 749 F.Supp. 1555, 1562 n. 3 (D.Kan.1990) (quoting *United States v. Flaherty,* 668 F.2d 566, 586 (1st Cir.1981)); *see also Merritt v. International Brotherhood of Boilermakers,* 649 F.2d 1013, 1018 (5th Cir.1981) (magistrate's award of discovery expenses after judgment is still a pretrial matter); *Colorado Bldg. & Constr. Trades Council v. B.B. Andersen Constr. Co.,* 879 F.2d 809, 811 (10th Cir.1989) (although § 636 does not expressly authorize

magistrate's jurisdiction over post-judgment matters, "additional duties" clause of § 636(b)(3) may).

There is also case law holding that motions for Rule 11 sanctions are nondispositive. *See, e.g., Maisonville v. F2 Am., Inc.,* 902 F.2d 746 (9th Cir.1990), *cert. denied, Dombroski v. F2 Am., Inc.,* 498 U.S. 1025, 111 S.Ct. 674, 112 L.Ed.2d 666 (1991); *Bergeson v. Dilworth,* 749 F.Supp. 1555, 1561–62 (D.Kan.1990); *San Shiah Enterprise Co. v. Pride Shipping Corp.,* 783 F.Supp. 1334 (S.D.Ala.1992). *Contra Bennett v. General Caster Service,* 976 F.2d 995, 998 (6th Cir. 1992).

Nor does a motion for Rule 11 sanctions constitute a "claim" or "defense," for such motions present issues collateral to the merits of the underlying action:

> Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney [or party] has abused the judicial process, and, if so, what sanction would be appropriate.

*Cooter & Gell,* 496 U.S. at 396, 110 S.Ct. at 2456; *accord Willy v. Coastal Corp.,* —— U.S. ——, ——, 112 S.Ct. 1076, 1080, 117 L.Ed.2d 280 (1992) (because Rule 11 sanctions are collateral, district court may impose such sanctions in a case where it is later determined the district court was without subject matter jurisdiction); *Lupo v. R. Rowland & Co.,* 857 F.2d 482, 485 (8th Cir.1988) (like motion for attorney fees, Rule 11 motion raises a collateral and independent issue not integral to the merits of an action), *cert. denied,* 490 U.S. 1081, 109 S.Ct. 2101, 104 L.Ed.2d 662 (1989).

In light of the foregoing, I conclude that a magistrate judge has the authority to order sanctions pursuant to Rule 11.

## II. Requirements of Rule 11

Rule 11 of the Federal Rules of Civil Procedure requires that every paper filed with the district court be signed by an attorney or by the party. The signature constitutes a certificate by the signer that "to the best of the signer's knowledge, information, and be-

lief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." A pleading determined to be in violation of the rule subjects both the signer and the party he or she represents to "an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee."

"Rule 11 makes sanctions mandatory when a violation of the Rule occurs.... The issue is whether the person who signed the pleading conducted a reasonable inquiry into the facts and law supporting the pleading." *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir.1987). In determining whether a violation of Rule 11 has occurred, this court must apply an "objective reasonableness" standard to determine whether the pleading was frivolous, groundless, or advanced for an improper purpose. *Miller v. Bittner*, 985 F.2d 935, 938 (8th Cir.1993); *Isakson v. First Nat'l Bank*, 985 F.2d 984, 986 (8th Cir.1993); *Pulaski Cty. Repub. Comm. v. Pulaski Bd. of Com'rs*, 956 F.2d 172, 173–74 (8th Cir.1992); *N.A.A.C.P.—Special Contribution Fund v. Atkins*, 908 F.2d 336, 339 (8th Cir.1990); *O'Connell*, 812 F.2d at 395.

Although Welsh now argues that his naming OCA as a defendant in the amended complaint was reasonable in light of Judge Cambridge's ruling on OCA's motion for summary judgment, the fact that OCA's motion for summary judgment was denied is of little consequence. The denial of a motion for summary judgment does not preclude a grant of a motion for sanctions against the prevailing party. *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 960 (6th Cir.), *cert. denied sub nom.*, 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). In *Mann*, the court reasoned:

> When considering a Rule 56 motion for summary judgment, the district court views the evidence in the light most favorable to the non-moving party.... The district court does not weigh the evidence to "determine the truth of the matter but to determine whether there is a genuine issue for trial." ... In contrast, when evaluating a Rule 11 motion for sanctions, the district court "measure[s]" the conduct of the non-moving party's counsel "by an objective standard of reasonableness under the circumstances." ... The district court then weighs the evidence to determine if counsel's pleadings, motions or papers are well-grounded in fact or warranted by existing law.... Given the significant differences between these two approaches, it is not surprising that a district court's ruling on a Rule 56 motion for summary judgment need not determine the outcome of the district court's ruling on a Rule 11 motion for sanctions....

*Mann*, 900 F.2d at 960–61.

### A. Prefiling Investigation

Rule 11 requires that an attorney conduct a reasonable inquiry of the factual basis for a claim before filing a lawsuit. *Miller*, 985 F.2d at 938 (citing *O'Connell*, 812 F.2d at 395). To constitute a reasonable inquiry, the prefiling investigation must uncover a factual basis for the plaintiff's allegations, as well as a legal basis. *Id.* (citing *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991)). "A complaint containing allegations unsupported by *any* information obtained prior to filing violates the required prefiling factual investigation." *Brubaker*, 943 F.2d at 1373.

In determining whether counsel's inquiry was objectively reasonable, the district court must determine " 'whether a reasonable and competent attorney would believe in the merit of an argument.' " *Miller*, 985 F.2d at 939 (quoting *Dodd Ins. Servs. v. Royal Ins. Co. of America*, 935 F.2d 1152, 1155 (10th Cir. 1991)); *see also King v. Hoover Group, Inc.*, 958 F.2d 219, 223 (8th Cir.1992) (plaintiff's reliance on unpublished district court opinion was "clearly unreasonable"). The district court, however, should avoid using the wisdom of hindsight and should test the signor's conduct by inquiring what was reasonable to

believe when the pleading, motion, or other paper was submitted. *Mann v. G & G Mfg., Inc.,* 900 F.2d 953, 958 (6th Cir.), *cert. denied, Sloan v. G & G Mfg. Inc.,* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990).

The record shows that prior to filing this lawsuit, Welsh had several conversations with the plaintiff about the factual background of the case. Welsh reviewed the investigation booklet prepared by the plaintiff; obtained and reviewed the decedent's medical records; and contacted counsel for the hospital, ultimately obtaining copies of the sales documents for the two insufflators.

The August 8, 1988, invoice for the sale of the Olympus Hystero–Insufflator was from "OLYMPUS, Medical Instruments Division," and directed the buyer to "Mail remittance to PO Box 7118, San Francisco, CA 94120." The Hospital's corresponding purchase order named the seller as "Olympus Corp. of America."

Welsh then sent a notice of breach of warranty to "Olympus Corporation of America" at the California address found on the invoice. He received responses from "Olympus Corporation, Scientific Products Group" advising him that the manufacturer was "WISAP, Rudolf–Diesel–Ring 20, 8029 Sauerlach, West Germany," and from Olympus Corporation's insurer, Yasuda Fire & Marine Ins. Co. of America.

The evidence is in conflict as to whether Welsh consulted an expert at this phase of the litigation.[23] In any event, the circumstances under which April Temple died suggested that someone or something was at fault, and that Welsh acted reasonably in deciding to file a lawsuit of some kind. The issues presented in this motion are related only to Welsh's decision to name OCA as a defendant.

Welsh explained during the sanctions hearing that at the time he filed the complaint, he "knew for certain" that Olympus Corporation of America sold the equipment and that it was his experience that companies that dis-

tribute or sell often have a lot to do with the design, production and manufacture. Welsh understood that the original designer of the Olympus Hystero–Insufflator was WIS-AP/Germany but alleged that OCA was a designer and manufacturer of the machine because he "didn't know what [OCA] did after the machine got to them." Welsh also originally estimated that the case was worth about $75,000, which is within the jurisdictional limits of the court.

Based on the foregoing, I conclude that Welsh's initially naming OCA as a defendant in this case was objectively reasonable, and that no Rule 11 violation occurred when the complaint was originally filed.

### B. Continuing Duty

Rule 11, however, imposes a continuing duty upon attorneys to review and reevaluate cases. For the reasons discussed below, I find that plaintiff's counsel acted in violation of Rule 11 when he signed and filed the amended complaint on April 15, 1991.

Rule 11 "applies only when an attorney has signed a pleading, motion or other paper." *Adduono v. World Hockey Ass'n,* 824 F.2d 617, 621 (8th Cir.1987). In *Nichols v. Firestone Tire & Rubber Co.,* 127 F.R.D. 526, 528 (D.Neb.1989), Judge Cambridge held that under Rule 11, an attorney "is under a continuing duty to review and reevaluate a case in which he or she is representing a party," and that Rule 11 sanctions may be entered after the attorney has signed a pleading in furtherance of a frivolous claim (citing *Herron v. Jupiter Transp. Co.,* 858 F.2d 332, 336 n. 6 (6th Cir.1988); *Foval v. First Nat. Bank of Commerce,* 841 F.2d 126, 130 (5th Cir. 1988). The rule itself requires that every paper filed with the district court be *signed* by an attorney or by the party. The *signature* constitutes a certificate that "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the

---

**23.** Under Nebraska law, it appears that plaintiff would be required to present expert testimony to show that the insufflator was somehow defective: "When standards of performance of a product are not generally known, other evidence, usually expert testimony, is necessary to prove proper or acceptable standards of performance." *Delgado v. Inryco, Inc.,* 230 Neb. 662, 433 N.W.2d 179 (1988) (Syllabus of the Court).

extension, modification, or reversal of existing law...."

In this district, the continuing duty to review and reevaluate cases does *not* require that attorneys review their pleadings and, if necessary, modify them to conform with Rule 11. *Nichols,* 127 F.R.D. at 528. *See also, e.g., Beverly Gravel, Inc. v. Didomenico,* 908 F.2d 223, 226 (7th Cir.1990) (Rule 11 does not oblige counsel to amend the complaint as new evidence surfaces); *Hilton Hotels Corp. v. Banov,* 899 F.2d 40 (D.C.Cir.1990); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Assoc. Contractors, Inc.,* 877 F.2d 938 (11th Cir.1989) (Rule 11 does not impose a continuing obligation on plaintiff to amend the complaint, at least if the complaint was reasonably interposed in the first place), *cert. denied sub nom.,* 493 U.S. 1079, 110 S.Ct. 1133, 107 L.Ed.2d 1038 (1990); *Thomas v. Capital Sec. Servs.,* 836 F.2d 866 (5th Cir.1988) (*en banc* ); *General Dev. Corp. v. Binstein,* 743 F.Supp. 1115 (D.N.J.1990) (subsequent filings must be judged by information available when they are filed). *Contra Herron,* 858 F.2d at 336; *Mann,* 900 F.2d at 959; *Kale v. Combined Ins. Co.,* 861 F.2d 746 (1st Cir.1988); *Foval v. First Nat. Bank of Commerce,* 841 F.2d 126, 130 (5th Cir.1988).

Thus, in this district, it is the filing of a signed document with the district court that may trigger a Rule 11 violation. The integrity of each document so filed is judged by information available to the signor at the time of filing.

At the time he signed and filed plaintiff's amended complaint, Welsh had received the following information:

(1) Information from Bill Johnson that an "Olympus Hystero–Insufflator serial No. 8845745" was used during the procedure. Johnson also gave Welsh a copy of the sales documents for the machine. The Hospital's purchase order named the seller as "Olympus Corp. of America"; the invoice itself was from "OLYMPUS, Medical Instruments Division."

(2) Using the California address he received from Johnson, Welsh sent a notice of breach of warranty to "Olympus Corporation of America." He received a response from Richard Kester, Senior Vice President of "Olympus Corporation," 4 Nevada Drive, Lake Success, NY 11042–1179. Kester's letter indicated that Olympus Corporation was only a sub-distributor and that Welsh's notice had been forwarded to the manufacturer, "WISAP, Rudolf–Diesel–Ring 20, 8029 Sauerlach, West Germany."

(3) Welsh also received a response to the notice of breach of warranty from Yasuda Fire & Marine Ins. Co. of America, regarding "Insured: Olympus Corporation."

(4) Answer filed January 4, 1991, admitting that OCA was a corporation, but denying that OCA was incorporated in California and doing business in Nebraska. The answer alleged instead that OCA was incorporated in Delaware.

(5) OCA's answers and objections to interrogatories served January 8, 1991, provided the names of three people with information concerning the Hystero–Insufflator allegedly sold by OCA and also provided an unidentified employee of WISAP/Germany. Welsh did not depose any of these individuals at any time. Welsh was also advised that OCA had a videotape demonstrating the use of a hystero-insufflator. Welsh did not ask that the videotape be produced.

(6) In its response to plaintiff's request for admissions, served January 8, 1991, OCA informed plaintiff that OCA was a Delaware corporation, not a California corporation.

(7) OCA served the following answer to plaintiff's supplemental interrogatories on February 21, 1991: "The Hystero–Insufflator, which is the subject matter of plaintiff's Complaint, was designed and manufactured by WISAP Gesellschaft Fur Wissenschaftlichen Apparatebau MBH, Rudolf–Diesel–Ring 20, 8029 Sauerlach, West Germany. It was sold by Olympus Corporation, 4 Nevada Drive, Lake Success, New York 11042 to the hospital."

(8) The February 14, 1991 letter from WISAP's attorney, John Green, to Judge Cambridge informed the recipients, includ-

ing Welsh, that "[i]t appears that the equipment in question was manufactured in Germany."

In spite of receiving this information, Welsh deliberately declined to affirmatively investigate OCA's corporate status. He filed the amended complaint on April 15, 1991, again alleging that OCA was "organized under the laws of the State of California, and authorized to do and is doing business in the State of Nebraska." The statute of limitations had not yet run, and Welsh could have sued the proper defendant had he performed even a cursory investigation of the matter.

Nor did OCA's answer to the amended complaint prompt Welsh to timely perform an investigation of OCA's corporate status, to depose any of the individuals named in OCA's responses to plaintiff's discovery requests, or to personally inspect the two insufflators.

Welsh has argued in his defense that OCA and Olympus Corporation were playing some kind of corporate "shell game" with respect to this lawsuit. At the sanctions hearing, Welsh stated that he still believed he sued the proper defendant, that he thought all the Olympus corporations were related, that OCA was a "sham corporation" formed because "they" had been notified about this case. Welsh acknowledged that he had no evidence OCA was a sham corporation; however, it did not make any difference to him because the corporations were all the same.

I find Welsh's explanation that he thought the corporations were "all the same" to be unconvincing. Welsh has been practicing law in Nebraska for over 20 years. Generally speaking, corporations are distinct legal entities and one corporation is not liable for the acts of another corporation even if the two corporations have the same name. Here, Welsh was aware of the existence of an "Olympus Corporation of America," incorporated in Delaware, as early as January 4, 1991. He knew that the equipment was originally designed and manufactured in Germany. Nevertheless, he again named "Olympus Corporation of America, a California Corporation" as a defendant in the amended complaint.

The statute of limitations ran on June 14, 1991. Welsh did not take any action to depose Paul Cable, the OCA officer who verified OCA's discovery responses, until September 30, 1991, in response to OCA's motion for summary judgment. Even then, the record suggests that this was not a serious attempt to depose Cable, as Cable resided in New York City and the deposition was scheduled to be taken in Omaha.[24] When Gotch informed Welsh that Cable would not appear to be deposed in Omaha, and offered to arrange a telephone deposition, Welsh declined to depose Cable by telephone. Welsh testified that he decided not to depose Cable because Welsh felt that "after our research and the specific information that we had concerning OCA," he did not need to spend the money to go to New York to refute OCA's summary judgment motion. He also declined to depose Cable by telephone, partly because "we felt that we didn't need the deposition because we had the proof." Welsh also testified that by this time he was convinced that the manufacturer of the insufflator was WISAP/Germany, not OCA.

Apparently, Welsh made no independent inquiry as to OCA's corporate status until approximately March 1992 when it became necessary to respond to OCA's requests for admissions. At this time, Welsh's associate made two telephone calls, confirming the existence of an old "Olympus Corporation of America" formed in New York in 1977 and later merged into "Olympus Corporation," and the existence of OCA, the defendant in this lawsuit, which was incorporated in Delaware in November 1989. The officers of Olympus Corporation and of OCA could all be reached at the same address on Nevada Drive in Lake Success, New York. Even at this late date, Welsh discovered nothing to establish that OCA was a "successor corporation." He did finally know that OCA was not even in existence at the time of April Temple's death.

24. *See* Fed.R.Civ.P. 26(b)(4).

## DECISION

In light of the foregoing, I can only conclude that Welsh violated Rule 11 when he signed and filed the amended complaint on April 15, 1991. A reasonable attorney, having been informed that the defendant was incorporated in another state than that alleged in the complaint, would be put on inquiry and would have performed some investigation, two or three telephone calls, to verify the defendant's corporate status. Welsh did not do so until March 1992. Despite the apparent history of animosity between Gotch and Welsh,[25] Welsh was not free to disregard OCA's pleadings and discovery responses. He did so at his own peril.

Sanctions are mandatory when a Rule 11 violation occurs. *Happy Chef Sys., Inc. v. John Hancock Mut. Life Ins. Co.*, 933 F.2d 1433, 1438 (8th Cir.1991); *O'Connell v. Champion Intern. Corp.*, 812 F.2d 393 (8th Cir.1987). I find that monetary sanctions are appropriate under the facts of this case.

In deciding to award sanctions against plaintiff's counsel, the court is not unsympathetic to the predicament of a plaintiff who, as in this case, has limited financial resources. Often, such plaintiffs are at a disadvantage conducting discovery against well-funded corporate defendants, and the court does not feel that Mr. Welsh acted inappropriately in attempting to minimize his client's discovery costs. However, the record strongly suggests that Welsh's failure to investigate OCA's corporate status was more related to his dislike or distrust of Gotch than to a concern for the client's finances. Under Rule 11, Welsh also had a duty to the court and to OCA, and the award of sanctions is based on Welsh's failure to conduct a cursory, inexpensive investigation—two long-distance telephone calls—when he was put on notice that he had sued the wrong corporation.

The Rule 11 violation occurred on April 15, 1991. I find that OCA is entitled to recover from plaintiff's attorney, James Welsh, as sanctions its attorney's fees and expenses reasonably incurred after April 15, 1991, including attorney's fees and expenses incurred in prosecuting this motion.

IT IS ORDERED:

(1) Plaintiff's attorney, James Welsh, shall pay all costs, including attorney's fees, reasonably incurred by Olympus Corporation of America after April 15, 1991 in defending this lawsuit, including fees and expenses incurred in prosecuting this motion.

(2) Counsel shall confer regarding an appropriate amount to be awarded pursuant to this order and, if agreement is reached, shall file a stipulation to that effect on or before *July 9, 1993.*

(3) If agreement is not reached, a determination will be made by the court regarding the amount of fees and expenses claimed on behalf of Olympus Corporation of America incurred after April 15, 1991, including all fees and expenses incurred in prosecuting this motion. Fees and expenses claimed are to be submitted to counsel for James Welsh on or before *June 14, 1993.* The parties shall disclose the names of all expert witnesses on or before *July 9, 1993.* All depositions of expert witnesses shall be completed on or before *July 30, 1993.* If the parties so stipulate, the matter will be submitted for the court's determination on the basis of the depositions. If a hearing is required, it will be held *Tuesday, September 21, 1993, at 1:30 p.m.*

DATED this 19th day of May, 1993.

## ORDER

The matter at issue is the post-judgment motion of defendant Olympus Corporation of America (OCA) (Filing No. 93). By order of

25. The lack of civility demonstrated by opposing counsel in this case is appalling. Each admitted refusing to telephone the other, claiming the attempt would be meaningless because of the other's failure to accept or return telephone calls. The common courtesies expected of legal practitioners such as returning telephone calls, giving sufficient notice of non-attendance at out-of-state depositions, and failing to copy communications to opposing counsel are but some of the lapses of courtesy in this case. Because continued conduct of this nature affects people other than opposing counsel and only fosters the negative image of the legal profession erroneously held by some members of the public, I am constrained to remind us all that it is only through the respect we show to others that we deserve to call ourselves "professionals."

this court filed May 19, 1993, the history of the litigation and the court's analysis were set out. That order is incorporated herein by this reference as if fully set forth.

After concluding that sanctions against attorney James Welsh were appropriate, the court required counsel to confer regarding the appropriate amount to be awarded pursuant to this order and, if agreement was reached, to file a stipulation. Agreement was not reached. For that reason, fees and expenses claimed by OCA were filed with the court and submitted to counsel for James Welsh. The parties have briefed the issue of the amount of the sanctions. The motion (Filing No. 93) is now at issue.

### EXPERT FEES

Pursuant to the court's order (Filing No. 123), on June 10, 1993, OCA filed its Calculation of Sanctions (Filing No. 124). At the same time, that calculation was forwarded to counsel for James Welsh with a cover letter copied to the court. The cover letter identified the experts OCA intended to call if Welsh contested the fairness and reasonableness of the charges claimed in the calculation. Apparently, by agreement of the parties, counsel for Welsh was to inform OCA whether Welsh would contest the sanctions claimed on or before June 23, 1993 (Filing No. 125 at Ex. A).

The parties did communicate, but there was confusion regarding whether or not Welsh would contest the attorney's fees issue in a manner which would require expert testimony (Filing No. 125, Ex. B–D). Attorney Welsh then filed a designation of expert witnesses which included a motion in limine (Filing No. 126), indicating that Welsh would call no expert witnesses and that Welsh took the position that no expert testimony was necessary on the issues yet to be determined by the court. In order to clarify the positions of the parties, a telephone conference call was held by the court on or about July 15, 1993. That conference call resulted in a final deadline being set for OCA's claims for expenses and attorney's fees and a deadline for Welsh's notification of factual objections.

In compliance with the court's order, OCA filed an amendment to OCA's Calculation of Sanctions (Filing No. 130) and, in compliance with the order, Welsh informed the court by letter that there would be no factual objections to the amendment.

On August 19, 1993 the court again held a hearing by telephone conference call at which time it was determined that no evidentiary hearing would be necessary and a briefing schedule would be submitted (Filing No. 132).

This detailed history illuminates the confusion which plagued the issue of whether or not expert witness testimony would be necessary on the issue of the attorney's fees and expenses claimed as sanctions by OCA. Given this confusion, it was not improper for the attorneys for OCA to contact expert witnesses and incur fees in order to have those expert witnesses begin preparing for their opinion of the fairness, reasonableness and necessity of the legal fees expended. A review of the billings submitted by the attorneys designated as experts by OCA indicate that they were informed by OCA's attorneys that their services would no longer be necessary in mid-July, and each expert closed his file at that time.

Based upon the confusion evidenced by both parties and shared on some occasions by the court, I do not find that the expert fees incurred were unnecessary or unwarranted. OCA is entitled to be compensated for the fees it has paid to the designated experts.

### FEES OF ATTORNEY GOTCH

Welsh argues that OCA should not be compensated for the fees of Gotch incurred after the law firm of Katskee, Henatsch & Suing was retained to represent OCA on the motion for sanctions. As Welsh characterizes Gotch's position, Gotch "becomes a client, rather than an attorney pursuing this case." (Brief dated September 10, 1993).

In point of fact, the client at all times was OCA, not Gotch. Gotch was a witness in the action as was Welsh. Neither of them can clearly be characterized as pure fact witness or pure expert witness with respect to his testimony and work relating to the motion

for sanctions. A review of the Gotch billing statements indicates he continued to serve as counsel for OCA and participated in preparing briefs and preparing potential expert witnesses. Gotch and Welsh are both in that unique position of a treating physician who is both a fact witness to a broken leg and an expert witness with respect to the care given and the patient's diagnosis and prognosis.

I cannot extricate from the statements before me that time in which Gotch was purely a fact witness from that time in which he was either an expert witness or an attorney who continued to provide legal services to OCA. For that reason, I will make no adjustment in the attorney's fees claimed as reimbursement for those fees paid to attorney Gotch.

### CONCLUSION

I am not unmindful of the significant amount of money claimed as a sanction against attorney Welsh in this case. It is however an accurate reflection of the fees and expenses incurred by OCA as a result of Welsh's actions and inactions with respect to his position as an officer of this court. For these reasons, I will assess as sanctions against attorney James Welsh personally all of the fees and expenses claimed in OCA's Amended Calculation of Sanctions.

**IT IS ORDERED that:**

1. The motion of defendant Olympus Corporation for Rule 11 sanctions (Filing No. 93) is granted; and

2. Attorney James Welsh shall pay the total amount of $39,959.75 as sanctions to Olympus Corporation of America **on or before December 31, 1993.**

DATED this 19th day of October, 1993.